**GREATER CINCINNATI COALITION FOR THE HOMELESS and Charles Gooden, Plaintiffs–Appellants,**

v.

**CITY OF CINCINNATI, Defendant–Appellee.**

No. 93–3938.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 12, 1994.

Decided June 7, 1995.

712

Robert B. Newman (argued and briefed), Kircher, Robinson, Cook, Newman & Welch, Cincinnati, OH, for plaintiff-appellant.

Karl P. Kadon, III, and Mark S. Yurick (argued and briefed), City Solicitor's Office for the City of Cincinnati, Cincinnati, OH, for defendant-appellee.

Before: KEITH and DAUGHTREY, Circuit Judges; JOINER, District Judge.*

DAUGHTREY, Circuit Judge.

The Greater Cincinnati Coalition for the Homeless and Charles Gooden filed a complaint against the City of Cincinnati seeking injunctive, declaratory, and monetary relief for alleged damages suffered after enactment of what the plaintiffs term a municipal "anti-begging ordinance." The plaintiffs maintain that the provisions of the ordinance unconstitutionally infringe upon their rights of free speech guaranteed under the First and Four-

---

* The Honorable Charles W. Joiner, United States District Court for the Eastern District of Michigan, sitting by designation.

teenth Amendments to the United States Constitution. The district court determined, however, that neither the Coalition nor Gooden has standing to contest the legality of the challenged ordinance. We now affirm that conclusion and the district court's dismissal of the plaintiffs' complaint.

## I. *Factual and Procedural History*

In its order addressing the City's motion to dismiss the complaint for lack of standing, the district court admirably summarized the pertinent facts involved in this challenge. That ruling stated:

> In the spring of 1992 a number of downtown Cincinnati retailers complained to members of City Council that "beggars" distracted and discouraged their customers and adversely affected their businesses. In response, the City enacted an emergency ordinance, effective May 20, 1992:

> No person shall recklessly interfere with pedestrian or vehicular traffic in a public place.

> 'Interfere with pedestrian or vehicular traffic' as used in this section means to do any of the following:

> (a) Walk, stand, sit, lie, or grab, touch or approach another person, in a public place, so as to block, interfere with, or impede the passage of any person or any vehicle, or to cause any person or any driver of any vehicle to alter his or her intended direction of travel; or

> (b) Make a request, solicitation or demand for money or other thing of value, in a manner which would alarm, intimidate, threaten, menace, harass, or coerce a reasonable person; or

> (c) Force oneself upon the company of another by continuing to communicate a request, solicitation or demand for money or other thing of value, to another person after the person gives notice or demonstrates by word or action that such communication is offensive, unwelcome or should cease.

> 'Public place' as used in this section includes streets, sidewalks, parks, plazas, parking lots, driveways, public or private buildings open to the public and doorways and entrances to buildings or dwellings.

> Whoever violates this section is guilty of a misdemeanor of the fourth degree.

Cincinnati Municipal Code § 910–13 (the Ordinance). Plaintiffs contend that the Ordinance violates their rights under the First and Fourteenth Amendments.

Plaintiff Gooden is a sixty-one-year-old man who has lived in the Cincinnati area since the 1950's. At the time the complaint was filed Gooden was homeless. He presently resides in an apartment within the City of Cincinnati.

Gooden receives Supplemental Security Income each month and has, at times, supplemented his income by politely asking strangers to give him money. His typical method is to approach people walking on the sidewalks of Cincinnati and to ask something like, "Sir, can you help me out, get me something to eat?" Sometimes people give him money, sometimes they do not. If the person refuses, Gooden does not grab or block the person's way. He tries to be polite, saying, "Thank you, sir" or "Thank you, ma'am", no matter what response he receives.

There are, according to Gooden, many individuals who become angry when a stranger rejects their request for money or assistance. Gooden, however, believes that one should not become angry when people refuse to give money or give only a small amount of money. He believes he acts reasonably when asking others for money or help.

Gooden receives an average of $25.00 in two to three hours when he engages in this activity. He uses the money to buy food or alcohol. To his credit, Gooden refused alcohol for the three months prior to the evidentiary hearing.

At one point during the summer of 1992 a Cincinnati Police Officer (known on the streets as "Kojack") wrote Gooden a ticket for what Gooden characterizes as "panhandling." The record does not contain a copy of the ticket, and Gooden does not recall the particular ordinance or statute he was charged with violating. Gooden testified that when he appeared in Municipal Court, Judge Painter, "threw the whole case out." On another occasion in late 1992 a Cincinnati

Police Officer told plaintiff to "move along" without giving him a ticket.

Gooden does not want to be arrested under the Ordinance for asking others for money or help. He, consequently, has either curtailed or altogether ceased this activity. If this Court enjoins enforcement of the Ordinance, Gooden intends to supplement his income in the future, when necessary, by asking others for money in a polite manner.

Plaintiff Greater Cincinnati Coalition for the Homeless (the Coalition) is an unincorporated association founded in 1984 consisting of forty to forty-five member agencies as well as church groups and individuals. Members of the Coalition work to provide emergency resources for the homeless including shelter and food. The Coalition coordinates the policies pursued by its members and lobbies at the state and municipal level on behalf of homeless people living in Cincinnati. Its lobbying efforts have included "petitioning the City of Cincinnati not to demolish the Milner Hotel, and to stop arresting panhandlers ..." The Coalition has urged the Ohio General Assembly to restore benefits available to homeless individuals under the General Assistance program. The Coalition has not instructed its members or homeless individuals about the meaning of the Ordinance.

Michael Fontana, Director of the Coalition, has witnessed and experienced panhandling in Cincinnati between twenty-five to fifty times during the past year. Typically, a man will approach him and politely ask, "Can you spare some change?" Fontana testified that people who have approached him have acted reasonably and never recklessly. Fontana testified that there is a general impression on the streets of Cincinnati that police officers will use the Ordinance in an effort to stop all persons from soliciting funds from strangers. Fontana, however, was unable to identify a specific police officer who used the Ordinance in an effort to stop all soliciting in Cincinnati. Based upon his own observations as well as information gained from downtown business owners, Fontana asserts that some decrease in the amount of soliciting occurred in Cincinnati after the Ordinance took effect. The City disputes this assertion.

In his affidavit Fontana states the following:

The effect of the passage of the anti-begging ordinance on the Coalition and the Coalition members is to further tax their resources inasmuch as the minimal amounts of money and work that beggars could beg are now amounts that Coalition members must seek elsewhere.

*　　*　　*　　*　　*　　*

Shortly after the passage of the new panhandling ordinance there were 50 panhandlers arrested in the first week. Following the initial enforcement activity panhandling dropped dramatically. Panhandlers did not want to get arrested.

I know of people who had ceased their begging activities for fear of harassment from the police. This harassment did not necessarily always constitute arrest or citation, but sometimes simply was an order for the person to move out of the Central Business District. Every arrest I am aware of has taken place in the Central Business District. But I am aware of panhandling activity in areas as diverse as Over-the-Rhine, Walnut Hills, Corryville, and Clifton.

As a result of the enforcement activity following the readoption of the begging ordinance the Social Service Agencies that make up the Homeless Coalition have assumed an even greater burden because homeless people are coming to them in a state of complete destitution.

Patrick Clifford is the administrative coordinator at the Drop Inn Center, a member agency of the Coalition. The Drop Inn Center provides transitional housing for approximately 250 people per day as well as drug and alcohol treatment programs, food, showers, and personal hygiene items. The Drop Inn Center does not have the financial resources to provide free coffee, laundry services, or soft drinks. People may purchase coffee for $.25 and soft drinks for $.50 from machines at the Drop Inn Center. After the Ordinance took effect, some of the homeless people coming to the Drop Inn Center could not afford to purchase soft drinks or coffee. Clifford did not allege or quantify any eco-

nomic loss to the Drop Inn Center due to the enactment of the Ordinance.

Clifford states in his affidavit:

Some people I know at the Drop Inn Center regularly get cited for panhandling, get 4 or 5 citations with fines in excess of $100.00, get processed by the system, and then get released back to the Drop Inn Center.

Clifford testified that there was a "noticeable crackdown on begging" when the Ordinance took effect. During the summer of 1992 he observed police asking people soliciting money or help to move along, but he does not know whether the Ordinance was enforced.

The parties have stipulated the following: "As a result of enforcement activity following the readoption of [the Ordinance], Coalition members have assumed a greater burden because homeless people are coming to them in a complete state of destitution."

(Footnote and citations to the record omitted.)

After examining these facts in the context of the applicable law, the district court granted the motion of the City to dismiss the plaintiffs' complaint. In so ruling, the court concluded that neither the Coalition nor Gooden had alleged sufficient injury resulting from passage and enforcement of the ordinance to confer standing upon them to challenge the constitutionality of the enactment. On appeal, the plaintiffs insist that the district court erred in ordering the dismissal of this action.

## II. *Analysis*

■ A determination of a party's standing to maintain an action is a question of law that this court reviews *de novo*. *Kelley v. Selin*, 42 F.3d 1501, 1507 (6th Cir.1995). In conducting that review, we must accept as true all allegations contained in the complaint and must construe the complaint in favor of the plaintiffs. *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 109, 99 S.Ct. 1601, 1612–13, 60 L.Ed.2d 66 (1979). If, under Article III of the federal constitution, a party does not have standing to bring an action,

however, a court has no jurisdiction over the matter and an order of dismissal must be entered. *DeBolt v. Espy*, 47 F.3d 777, 779 (6th Cir.1995).

■ Pursuant to the provisions of Article III of the United States Constitution, the judicial power of the United States extends only to certain enumerated classes of cases or controversies. In order to establish standing sufficient to satisfy the "case or controversy" requirement of Article III, a plaintiff in federal court must allege " 'such a personal stake in the outcome of the controversy' as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf." *Warth v. Seldin*, 422 U.S. 490, 498–99, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975) (quoting *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962)). As held repeatedly by the Supreme Court, allegation of "such a personal stake in the outcome of the controversy" necessitates establishment by the plaintiff of an actual or threatened injury, a causal connection between that injury and the defendant's conduct, and a likelihood that a court decision in the plaintiff's favor will redress the injury alleged. *See, e.g., Northeastern Fla. Chapter of Associated Gen. Contractors v. City of Jacksonville,* —— U.S. ——, ——, 113 S.Ct. 2297, 2302, 124 L.Ed.2d 586 (1993); *Valley Forge Christian College v. Americans United for Separation of Church and State*, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982).

This court has also recognized both the constitutional and prudential aspects of standing. In *Pestrak v. Ohio Elections Commission*, 926 F.2d 573, 576 (6th Cir.), *cert. dismissed*, 502 U.S. 1022, 112 S.Ct. 672, 673, 116 L.Ed.2d 763 (1991), for example, we held:

Two matters are required for standing. First, there must be an actual case or controversy, which can be shown by proving an "injury in fact" that can be redressed by a favorable decision. Second, as a prudential matter, the plaintiff must be a proper proponent, and the action a proper vehicle, to vindicate the rights asserted.

■ The injury that must be alleged may be either a past or a future injury. *Id.*

Especially when First Amendment rights and freedoms are involved, courts do not require that a litigant actually undergo criminal prosecution in order to challenge an allegedly unconstitutional enactment. *Id.* Nevertheless, a threat of injury alleged by a plaintiff must be " 'real and immediate,' not 'conjectural' or 'hypothetical.' " *City of Los Angeles v. Lyons,* 461 U.S. 95, 102, 103 S.Ct. 1660, 1665, 75 L.Ed.2d 675 (1983).

## A. *Gooden's Claim*

■ The district court correctly concluded in this case that plaintiff Gooden could not establish either an actual injury or a "real and immediate" threat of injury from passage and enforcement of the challenged Cincinnati ordinance. Although Gooden alleges that he was arrested for begging in 1992, he concedes that the judge ruling upon the infraction "threw the whole case out." Furthermore, because Gooden could not produce any documentary information regarding the arrest and court appearance, the district court had absolutely no evidence before it from which it could conclude that enforcement of the ordinance at issue in fact was responsible for the unsuccessful prosecution.

Finally, and most importantly, Gooden admitted that he has not in the past violated the terms of the 1992 enactment and that he has no intention of violating the explicit terms of the ordinance in the future. The plaintiff described for the district court the polite manner in which he solicits money from passersby on the street and his plan to continue the non-threatening begging should he choose to solicit in the future. Therefore, the activities and speech exercised by Gooden do not fall within the strictures of the ordinance which proscribes only "reckless" interference with persons or vehicles in public places.

Under Ohio law:

A person acts recklessly when, with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result or is likely to be of a certain nature. A person is reckless with respect to circumstances when, with heedless indiffer-

ence to the consequences, he perversely disregards a known risk that such circumstances are likely to exist.

Ohio Rev.Code § 2901.22(C). Gooden has, therefore, failed to establish that speech such as that in which he engages is or will necessarily be suppressed by law enforcement authorities. Because Gooden is unable to allege a direct and palpable injury, or even the immediate threat of such injury, from enforcement of the municipal code provision, the district court properly concluded that Gooden was without standing to challenge the constitutionality of the city ordinance.

## B. *The Coalition's Claim*

The Coalition also asserts standing to challenge the municipal ordinance at issue in this case. The organizational plaintiff contends not only that it has suffered injury itself from the enforcement of the code provision, but also that it may assert representational standing on behalf of its members and may challenge the ordinance for affected individuals not before the court, so as to protect the First Amendment rights of those third parties. We find all three alleged bases for Coalition standing to be without merit.

### 1. *Direct Injury to Coalition*

The Coalition first insists that it has suffered direct injury from the enactment and enforcement of the ordinance. Specifically, it argues that the stated purpose of the organization—"to provide stop-gap relief as well as to educate the public of the plight of the homeless"—has been frustrated by the city's alleged efforts to rid the streets of the homeless and give the illusion that Cincinnati does not experience a homeless problem.

■ A mere interest in a problem is not, however, sufficient to confer standing upon an organization. *Sierra Club v. Morton,* 405 U.S. 727, 739, 92 S.Ct. 1361, 1368, 31 L.Ed.2d 636 (1972). Instead, as recognized by the district court, the Coalition must establish "that its ability to further its goals has been 'perceptively impaired' so as to constitute[ ] far more than simply a setback to the organization's abstract social interests." *Havens Realty Corp. v. Coleman,* 455

U.S. 363, 379, 102 S.Ct. 1114, 1124, 71 L.Ed.2d 214 (1982). The Coalition cannot meet that burden in this case. The ordinance, as written, does not ban solicitation of funds by the city's homeless individuals. Rather, the legislation merely forbids the *reckless interference* with pedestrian or vehicular traffic in a public place. Such a prohibition in no way frustrates the Coalition's purposes of providing relief to the homeless or of educating the public about the plight of Cincinnati's dispossessed population.

■ The Coalition nevertheless argues that it has been harmed directly by passage of the ordinance because the Cincinnati police have systematically sought to clear the downtown area of homeless solicitors. The ordinance, however, does not authorize such drastic police actions. In the language of *Larson v. Valente*, 456 U.S. 228, 102 S.Ct. 1673, 72 L.Ed.2d 33 (1982), there must be "a 'fairly traceable' causal connection between the claimed injury and the challenged conduct," in order to substantiate an assertion of standing to sue. *Id.* at 239, 102 S.Ct. at 1680. In this case, we find no such connection between the claimed injury, that is, the purge of the homeless population from the downtown area, and the challenged conduct, that is, the enactment of the ordinance.[1]

Additionally, the Coalition submits that it has suffered direct injury as a result of the decrease in the amount of money available to the homeless. The organization argues that the restriction on harassing forms of solicitation has resulted in persons of greater destitution seeking financial and in-kind assistance from the Coalition and its members. The district court concluded, however, that "[t]he Coalition has not demonstrated any distinct and palpable increase in its expenditures as a result of the Ordinance." Even if such a showing had been made, plaintiff Gooden established that, while complying with the dictates of the ordinance, a downtown homeless solicitor could still collect an average of $25.00 in two or three hours of beg-

ging. The evidence of collection from legal begging and solicitation of an *average* hourly income that is in some cases more than double the federal minimum hourly wage earned by many of our nation's "working poor" belies the Coalition's assertion that the ordinance necessarily results in more destitute individuals in the city depending upon dwindling and overstretched Coalition resources for subsistence. Instead, such testimony, while not negating the validity of the allegation that more money is spent by the Coalition to combat the effects of homelessness, points to the conclusion that increased utilization of Coalition funds and services results from unspecified outside influences, or from hypothetical fears of illegal enforcement, rather than from the passage and proper execution of Cincinnati Municipal Code § 910–13. Consequently, the district court appropriately determined that the Coalition itself has suffered no actual or threatened injury from the enactment and enforcement of the ordinance sufficient to justify conferring standing upon the organization.

### 2. *Representational Standing Status of Coalition*

■ The Coalition next argues that it may assert standing in this matter on behalf of the members of the organization. The Supreme Court has recognized that "[e]ven in the absence of injury to itself, an association may have standing solely as a representative of its members." *Warth*, 422 U.S. at 511, 95 S.Ct. at 2211. In order to do so, however, the organization must demonstrate that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977).

---

1. The plaintiffs have also failed to allege that City of Cincinnati has adopted a policy or custom authorizing the police to remove homeless individuals from the downtown area simply for exercising free speech rights. Any claim against the

city under 42 U.S.C. § 1983 must, therefore, fail. *See Meyers v. City of Cincinnati*, 14 F.3d 1115, 1117 (6th Cir.1994) (citing *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 694, 98 S.Ct. 2018, 2038, 56 L.Ed.2d 611 (1978)).

718

■ The Coalition cannot establish in this matter that any injury-in-fact has been inflicted upon its members as a result of the passage of the ordinance at issue. The organization attempts to satisfy that burden by intimating that the Drop Inn Center has suffered an actual injury because the destitution of many individuals occasioned by the enforcement of the ordinance has prevented those persons from purchasing coffee and soft drinks from the Center's vending machines. In light of Charles Gooden's testimony before the district court, however, we are again at a loss to understand the connection between the alleged destitution and the ordinance. Gooden stated that "polite begging" in accordance with the ordinance would still allow an individual to collect an average of $25.00 for every two or three hours of downtown solicitation. Such "income" surely is sufficient to permit individuals to expend the twenty-five or fifty cents required to purchase the beverages offered in the Center. Any vaguely defined, unquantified injury to the Center or to other members of the Coalition cannot, therefore, be traced to Cincinnati Municipal Code § 910–13. Because the members of the Coalition also cannot establish the requisite injury-in-fact to satisfy the first prong of the applicable three-part representational standing test, the Coalition also may not assert standing in this case on behalf of its individual members.

### 3. *Coalition's Standing to Assert Rights of Non-parties*

■ Finally, the Coalition's attempt to assert the free speech rights of individuals not presently before the court must fail. A "plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. at 499, 95 S.Ct. at 2205. In the First Amendment arena, however, especially when "there is a possibility that, rather than risk punishment for his conduct in challenging the statute, [an individual] will refrain from engaging further in the protected activity," courts have been willing to relax prudential standing limitations and permit a third party to assert the rights of a person not otherwise before the court. *Secretary of State of Md.*

*v. Joseph H. Munson Co.*, 467 U.S. 947, 956, 104 S.Ct. 2839, 2846, 81 L.Ed.2d 786 (1984).

■ Even in such situations, however, a court must still consider "whether the third party has sufficient injury-in-fact to satisfy the Art. III case-or-controversy requirement." *Id.* Here, however, the Coalition has again failed to meet the threshold injury-in-fact showing. Consequently, the district court properly ruled that the Coalition "may not seek to challenge the Ordinance on behalf of third-parties."

### III. *Conclusion*

Our conclusion that neither Gooden nor the Coalition has standing to challenge the ordinance, as written and as applied to these plaintiffs, should not be understood to foreclose all potential challenges to the enactment. If Gooden, the Coalition, or another plaintiff is subsequently able to establish that the ordinance is being enforced in such a manner as to infringe upon protected First Amendment rights, the federal courts will remain open and ready to safeguard the essential freedoms found in the free speech clause of the United States Constitution.

The ordinance, however, is written and enforced so as to discourage only reckless interference with pedestrian or vehicular traffic in public places, not begging or solicitation in general. Because neither Gooden, the Coalition, Coalition members, nor third parties not before the district court can establish a direct injury-in-fact or a threatened injury resulting from the present manner of enforcing Cincinnati Municipal Code § 910–13, we conclude that the plaintiffs in this case have no standing to challenge that ordinance. The district court's dismissal of the plaintiffs' complaint is, therefore, AFFIRMED.