Promise DOE, Kimberly C. and Russ C.,
and Small World Ministries, Inc.

v.

Donald SUNDQUIST, Governor of the
State of Tennessee, in his official capacity; Charles Burson, Attorney General
of the State of Tennessee, in his official
capacity; and Linda Rudolph, in her
official capacity as the Commissioner of
the Department of Human Services for
the State of Tennessee.

No. 3:96–0599.

United States District Court,
M.D. Tennessee,
Nashville Division.

Aug. 23, 1996.

[Page content redacted]

Larry Lamont Crain, Kevin H. Theriot, Brentwood, TN, for plaintiffs.

Dianne Stamey Dycus, Nashville, TN, for defendants.

***MEMORANDUM:***

JOHN T. NIXON, Chief Judge.

Pending before this Court is Plaintiffs' Motion for a Preliminary Injunction barring Defendants from unsealing and disclosing to any third persons confidential records contained in Plaintiffs' adoption files, which the State of Tennessee has in its custody. Doc. No. 79. Also pending before the Court is Plaintiffs' Motion to Consolidate the Preliminary Injunction Hearing with a Hearing on the Merits. Doc. No. 71.

The Court finds that Plaintiffs fail to meet the requisite standard of review to support a preliminary injunction, and therefore denies Plaintiffs' Motion for a Preliminary Injunction. The Court also denies Plaintiffs' Motion to Consolidate the Preliminary Injunction Hearing with a Hearing on the Merits.

***BACKGROUND:***

On May 15, 1996, the General Assembly of the State of Tennessee enacted Chapter 532 of the Tennessee Public Acts of 1996 ("the Act"). The Act includes a number of changes, which substantially alter certain aspects of adoption law in Tennessee. The new statute revises the process for obtaining access to the records of persons placed for adoption in the past. These records were sealed as a result of 1951 legislation which limited adoption record access to those adoptees who brought court proceedings and successfully demonstrated a compelling interest in accessing their sealed files. The 1996 Act would permit immediate access to the formerly sealed records for adult adoptees, certain close relatives, and legal representatives upon the verification of those persons' identities. As a protective measure, the 1996 Act enables persons whose identities are sought to register for a veto prohibiting contact with themselves and their families without their approval. Enforcement of the "no contact" veto by the persons sought would be through civil injunctive and damages action. Violation of the veto can also result in criminal sanctions under the Act.

Plaintiffs in this case are Promise Doe and Jane Roe, women who had given children up for adoption under the prior statutory scheme, Kimberly C. and Russ C., the adoptive parents of two children who became part of the C. family under the previous legal framework, and Small World Ministries, a Tennessee adoption agency, which facilitated adoptions under the prior law. Plaintiffs bring suit against the following persons in their official capacities: Donald Sundquist, Governor of the State of Tennessee, Charles Burson, Attorney General of the State of Tennessee, and Linda Rudolph, Commissioner of the Department of Human Services for the State of Tennessee.

In their efforts to obtain injunctive relief, Plaintiffs challenge the portion of the 1996 Act which allows adult adoptees, certain of their close relatives, or their representatives to access formerly sealed files. Additionally, Plaintiffs take issue with the Act's prospective provisions which will allow adoptees, relatives and representatives to access sealed files in the future as adopted children reach the age of majority. Plaintiffs contend that the challenged provisions of the Act violate their familial right of privacy under the United States Constitution, their legitimate expectation that their identities and identifying information would remain confidential, and their constitutional right of privacy under the Tennessee Constitution. Further, Plaintiffs maintain that the historical underpinnings of adoption law in the United States favor the preservation of privacy of adoption records, and that Defendants are estopped from breaching their promise to maintain the confidentiality of such records.

Defendants respond by arguing that a preliminary injunction is improper on the grounds that Plaintiffs are unlikely to succeed on the merits of their claim, Plaintiffs cannot show a probability of irreparable harm if an injunction is not granted, the issuance of an injunction will likely harm others, and the issuance of an injunction is contrary to the public interest.

Plaintiffs sought and obtained a Temporary Restraining Order enjoining enforcement of the Act on June 25, 1996. Doc. Nos. 2, 10. By agreed order the matter proceeded to a hearing regarding further injunctive relief, which took place on July 25, 1996. Doc. No. 11. After reviewing the exhibits filed with this Court and evaluating the testimony and arguments presented, the Court finds that the Plaintiffs fail to meet the requisite standard of review to support a preliminary injunction. Accordingly, the Court denies Plaintiffs' Motion.

***LEGISLATIVE HISTORY AND STATUTORY BACKGROUND:***

The first discussion of adoption in Tennessee law appears in 1852 when the Tennessee General Assembly granted jurisdiction to the county and circuit courts authorizing the adoption of children on application. *See* 1852 Tenn.Pub.Acts, Chap. 338. At that time, the Court recorded the names of the parties and the terms of an adoption. *Id.* The first statutes addressing confidential adoption records appear in 1917 in connection with "foundlings or other abandoned children whose parentage is unknown, and who have not been assigned by court order to a child-caring organization." 1917 Tenn.Pub.Acts, Chap. 120, § 5, sub.sec. 4. The legislature indicated that a judge "in his discretion" could "require that all papers relating to the personal history of such child or family history if any is of record, be sealed and filed in the county archives, to be unsealed only by judicial order." *Id.*

In 1949, the Tennessee General Assembly amended the state's adoption statutes and sealed records of the adopted child's "real name," any information obtained by the Tennessee Department of Public Welfare in its investigation of the adoption petition, and any reports filed by the Department with the court. 1949 Tenn.Pub.Acts, Chap. 127 §§ 3, 5, and 6. However, the law also stated that "upon petition by an adopted person who is over twenty-one ...," a judge could require the department to deliver "the secret records relating to said adopted person" and the judge would open and inspect the records and release to the adopted person any contents as he "in his sound discretion" deemed to be in the best interest of the adopted person and to the State of Tennessee. *Id.* § 8. In 1951, the statute was again amended, and the legislature placed all adoption records under seal and forced adoptees seeking information to file a court order. 1951 Tenn.Pub.Acts, Chap. 202 § 24. Disclosure was predicated upon a court finding that it would be in the best interest of the adoptee or the public to have the information released. *Id.* at § 26. The current challenged proposals represent the first changes to the adoption law as amended since 1951.

Those proposals were generated by the Tennessee Adoption Law Study Commission (ALSC). In 1993, State Senator Douglas Henry co-sponsored Joint Resolution No. 17, which formalized the ALSC. Affidavit of Senator Douglas Henry, Doc. No. 77, p. 1. The state legislature created the Commission to study all aspects of Tennessee adoption law in order to revise, update, and clarify existing law. *Id.* The eleven member ALSC began its study in August 1993 and held a number of statewide public hearings soliciting public comment on the current adoption process and avenues for revision. *Id.*, p. 3. The ALSC presented its recommendations to the Tennessee General Assembly in 1995, which led to the promulgation of the Adoption law currently at issue.

When the challenged Adoption Reform law was introduced and first considered by the Tennessee General Assembly in 1995, several legislators expressed concerns over the bill's ability to adequately protect the privacy of the biological parents who entered into the adoption process. Affidavit of State Representative Carol J. Chumney, Doc. No. 89, p. 2. As a result of these concerns, the legislature delayed until July 1, 1996 the effective date of the portion of the bill dealing with confidential records for adoptions occurring subsequent to March 16, 1951. Additionally, the legislature formed a Joint Adoption Study Committee (JASC) to consider the adequacy of the privacy protection afforded by the bill. *Id.*

Subsequently, State Representative Carol Chumney, a member of the JASC, introduced legislation in the House, accompanied

by companion bills in the Senate sponsored by Senators David Fowler and Doug Henry, to restore privacy protection for biological parents who entered into the adoption process after March 16, 1951. *Id.* at 3, 1. The Tennessee State Legislature's full House and full Senate Judiciary Committees voted in the spring of 1996 to revise the bill, heightening protection for adoptees or birth parents who did not wish to have their identities divulged. *Id.* at 4. The House reauthorized the prior mutual consent process for adoptions occurring between March 16, 1951 and July 1, 1996, and required an expanded contact veto provision for adoptions finalized after July 1, 1996. *Id.* The revised contact veto allowed for the redaction of identifying information which could lead to unwanted contact or disclosure from confidential files requested by adoptees, birth parents, or their representatives. *Id.* The Senate Judiciary Committee endorsed an amendment that would have expanded the law's contact veto provisions to remove identifying information from confidential adoption files. *Id.*

However, the bill was subsequently assigned to the House Budget Subcommittee for consideration of its fiscal impact. *Id.* at 4–5. Although the Budget Subcommittee found the bill would result in a "not significant" increase in expenditure, the Subcommittee called for revision of the bill on the basis of its fiscal impact. *Id.* at 5. The Budget Subcommittee, for what appeared to Chumney to be fiscal reasons, ultimately scaled back the Judiciary Committee's proposed amendment increasing privacy protections. *Id.* The Budget Subcommittee agreed instead to an amendment creating a cause of action against persons who use confidential adoption information to harm someone and heightening privacy for those biological parents who were victims of rape or incest. *Id.*, and *see also* Senate Bill No. 3099, Public Chapter 1068, Exhibit H., attached to Doc. No. 89. The General Assembly passed additional amendments clarifying access to records, and indicating that home studies and confidential records maintained by Crisis Pregnancy Centers, psychologists, and other professionals would remain confidential in the absence of a court order. Brief Amicus Curiae of Senator Jim Holcomb, Representative Joe Fowlkes, Caprice East, Doc. No. 73, p. 8.

### *DISCUSSION:*

■ It is not a function of the courts to determine the wisdom of a statute. *Tennessee Valley Authority v. Hill,* 437 U.S. 153, 194, 98 S.Ct. 2279, 2301–02, 57 L.Ed.2d 117 (1978). Thus, questions regarding the Tennessee General Assembly's prudence in failing to provide greater protection for birth parents and adoptees wishing to keep their identities confidential have no bearing on this Court's decision as to the appropriateness of a preliminary injunction.

In determining whether to grant a preliminary injunction, the Court must apply the following four factors: (1) the likelihood of the Plaintiffs' success on the merits; (2) whether or not the Plaintiffs will suffer irreparable injury if the preliminary injunction does not issue; (3) whether or not the injury outweighs the harm to other parties if the preliminary injunction is granted; and (4) whether the grant of a preliminary injunction is in the public interest. *NAACP v. City of Mansfield, Ohio,* 866 F.2d 162, 166 (6th Cir., 1989); *International Resources, Inc. v. New York Life Insurance Co.,* 950 F.2d 294, 302 (6th Cir., 1991), *cert. den.*, 504 U.S. 973, 112 S.Ct. 2941, 119 L.Ed.2d 565 (1992).

■ In the current matter, Plaintiffs' request for a preliminary injunction is based in large part on the argument that the Act is unconstitutional because it interferes with Plaintiffs' fundamental constitutional rights and it violates the Constitution's Equal Protection Clause. According to a recent decision of this Circuit, a facial challenge to the constitutionality of a statute must be rejected unless there exists no set of circumstances in which the statute can be constitutionally applied. *Dean v. McWherter,* 70 F.3d 43, 45 (6th Cir., 1995). Applying the four factors enumerated above, the Court finds that Plaintiffs' claims do not meet the requisite standard of review to support a preliminary injunction.

A. **Likelihood of Success on the Merits:**

1. **Standing:**

Defendants argue that Plaintiffs lack standing to raise the issues presented in this action (Defendants' Memorandum in Opposition to Motion for Preliminary Injunction, Doc. No. 76). If Plaintiffs are without standing, clearly this Court cannot maintain jurisdiction over the dispute and an order to dismiss must be entered. *Greater Cincinnati Coalition for the Homeless v. City of Cincinnati,* 56 F.3d 710, 715 (6th Cir., 1995). The Court concludes that it would be precipitous at this time to dismiss Plaintiffs for lack of standing.

The Supreme Court has identified three requirements that plaintiffs must meet to establish standing. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 559–561, 112 S.Ct. 2130, 2135–2137, 119 L.Ed.2d 351 (1992). First the party must assert that he or she has suffered an injury in fact. *Id.* The plaintiff's injury must be "concrete and particularized," affecting the plaintiff in an individual and personal way. *Id.* The injury must also be actual or imminent. *Id.* Plaintiffs cannot establish standing by merely showing the potential for future harm. Second, plaintiffs have standing only if there is a causal connection between the injury and the conduct they are challenging. *Id.* Third, standing will exist only if there is the likelihood that the injury will be redressed if the Court grants the relief requested. *Id.*

Defendants' primary challenge to the standing of Plaintiffs Promise Doe, Jane Roe, Kimberly C., and Russ C. is that these Plaintiffs have not suffered an actual injury. Rather, Defendants assert that these Plaintiffs are alleging only speculative, future injury. The children of Plaintiffs Promise Doe, Kimberly C., and Russ C. are all six years of age or less. Defendants argue that any injury these Plaintiffs may experience as a result of the Act will not be realized until at least the year 2011, a time too distant and an injury too speculative to create standing. Similarly, Defendants maintain that Jane Roe alleges only the potential for future injury.

The Court determines, however, that injury to these Plaintiffs is immediate. Plaintiff Jane Roe has demonstrated a strong likelihood that her adult child will access formerly confidential adoption records immediately after the enactment of the Act. Although the adoption records of the natural and adopted children of Promise Doe, Russ C. and Kimberly C. will remain closed until the children reach 21 years of age, these Plaintiffs face immediate injury as a result of psychological impact that future disclosure of adoption records will have on them and their families. The Court finds that the contact veto available to these Plaintiffs does not eliminate the emotional injury of fear and concern. There are few relationships, if any, in which emotional injuries are more real than in the relationship between parents (adoptive or biological) and their children. Accordingly, the Court finds that these Plaintiffs have established the existence of an injury in fact.

Further, the Court concludes that there is a causal connection between the Plaintiffs' injuries and the challenged Act. There is no doubt that under the 1996 Act, adoption records are more easily accessible to adopted children and their legal representatives than they were previously. The nature of the information available from such records gives rise to Plaintiffs' injuries, as it requires that identifying information concerning the adoptive and biological parents be accessible once the child is 21 years old. The Court finds that there is a clear relation between the Act and the injury claimed by these Plaintiffs.

Finally, the Court finds that the relief requested by these Plaintiffs, if granted, would redress their injury. Since the Plaintiffs' injuries are based on the Act's requirement that the records of adopted children, including identifying information about the biological and adoptive parents, be accessible once the child reaches 21 years of age, an injunction preventing the law from being enforced will plainly redress these harms. Accordingly, the Court concludes that Plaintiffs Promise Doe, Jane Roe, Kimberly C. and Russ C. have met the three requirements of *Lujan,* and have adequately established standing before the Court.

Defendants also challenge the standing of Plaintiff Small World Ministries ("SWM"). The Court finds that SWM can establish standing by showing an actual injury to itself. *Sierra Club v. Morton,* 405 U.S. 727, 735–740, 92 S.Ct. 1361, 1366–1369, 31 L.Ed.2d 636 (1972). SWM has alleged that the Act will adversely affect women's decisions to place their children for adoption. Injury to an organization may be established by a showing that the organization will suffer diminished financial support or membership. *NAACP v. Alabama,* 357 U.S. 449, 459–60, 78 S.Ct. 1163, 1170–71, 2 L.Ed.2d 1488 (1958). Thus, if SWM were able to offer sufficient proof that the number of adoptions in Tennessee would diminish under the Act, it would have standing as a result of its imminent financial injury. The Court finds that the evidence presented thus far by the parties is conflicting as to the Act's potential impact upon adoption trends in Tennessee. For this reason, Plaintiff SWM's claims for injury in this respect are not sufficiently strong to warrant the granting of a temporary injunction. However, there is a sufficient issue regarding potential injury to prevent the Court from dismissing SWM for lack of standing at this time. If the case proceeds to trial and the record is further developed on this issue, Defendants can challenge the evidence regarding SWM's organizational injury on standing grounds, if they wish to do so. *Minority Employees of the Tennessee Department of Employment Security, Inc. v. State of Tennessee, Department of Employment Security,* 573 F.Supp. 1346, 1348 (M.D.Tenn., 1983) (stating that standing is a jurisdictional issue, and whenever lack of standing is discovered it is cause for dismissal); *Skolnick v. Board of Commissioners,* 435 F.2d 361, 363 (7th Cir., 1970) (dismissing case on appeal for grounds not cited by district court, e.g. lack of standing when dispositive statistics became available to the Court of Appeals).

This finding is bolstered by the Court's recognition that extensive personal information is required from both biological and adoptive parents in order for an adoption agency to work effectively and in the best interest of everyone involved. The Court takes notice, therefore, that one injurious effect on the decision to place a child for adoption may be that biological and adoptive parents will be less forthcoming with the information that they provide to adoption agencies.

For the reasons stated above concerning Plaintiffs Promise Doe, Jane Roe, Kimberly C., and Russ C., the Court finds that SWM has also met *Lujan*'s remaining two requirements that a causal connection exist between the injury and the challenged act, and that the relief requested be adequate to redress the injury.

## 2. Contractual Claims:

Plaintiffs contend that some birth parents might have relied upon adoption agencies' promises of confidentiality based on the former Tennessee adoption statute when they surrendered their children for adoption. Plaintiffs maintain that since the Act retroactively unseals adoption records that since 1951 have been unavailable except upon consent of the birth parent or court order, the Act breaches a contractual obligation of the State of Tennessee to keep the records sealed. Amended Complaint, Doc. No. 7, p. 15. However, officially, State adoption procedures have never promised total confidentiality to birth parents. This fact is reflected by the absence of references to confidentiality in the forms that birth mothers signed under the former statutory scheme to surrender their parental rights. Under the prior legislation, adopted persons were allowed to access their records at court discretion. This process created wide variance in access to adoption records for those who petitioned, as courts across the state applied their own interpretations of what constituted a "compelling" need for access to adoption records. Record of Adoption Commission, Exhibits A and B to Affidavit of Caprice East, Doc. No. 83. Further, in the judicial procedure formerly in force, biological parents did not receive notice that their identities might be revealed by court order, and were not given an opportunity to voice their own concerns regarding access. Thus, under the prior statute, birth parents did not have a guarantee of confidentiality.

 Plaintiffs criticize the Act's retroactive provisions. However, the State of Tennessee may pass retroactive, remedial legislation in areas reserved for state governance. As indicated above, adoption law is a state statutory creation. Therefore the Tennessee legislature was within its powers to amend its former adoption procedure. Although the Tennessee Constitution generally bars retroactive laws, retroactive legislation is permitted when it is remedial in nature. Tenn. Const. Art. I., § 20. *See also, Morris v. Gross,* 572 S.W.2d 902, 907 (Tenn., 1978) (noting the general prohibition on retroactive legislation under the Tennessee Constitution); *Morford v. Yong Kyun Cho,* 732 S.W.2d 617, 620 (Tenn.App., 1987) (holding that remedial legislation is permissible when providing the means or methods by which a cause of action may be effectuated, wrongs redressed, and relief obtained). Further, the retroactive nature of some of the Act's provisions does not render the Act unconstitutional under federal law. Federal law bars retroactive legislation when it violates the Due Process Clause of the Fifth Amendment by interfering with listed constitutional rights or with a right not specifically enumerated in the Constitution which the Supreme Court has deemed to be fundamental. As shall be shown below, the Act does not infringe upon the Plaintiffs' federal constitutional rights, and therefore, the retroactive and prospective aspects of the statute are permissible under the United States Constitution.

3. **Constitutional Issues:**

The Plaintiffs argue that under the Fourteenth Amendment the Act violates their fundamental rights—specifically, a familial right of privacy, a right to reproductive privacy, and a right to non-disclosure of personal matters. Although the United States Supreme Court fails to recognize a generally existing right to privacy, it has found that a right of personal privacy and autonomy, or a guarantee of certain privacy areas or zones exists under the Constitution's Fourteenth Amendment. *Roe v. Wade,* 410 U.S. 113, 152, 93 S.Ct. 705, 726, 35 L.Ed.2d 147 (1973), *reh'g denied,* 410 U.S. 959, 93 S.Ct. 1409, 35 L.Ed.2d 694 (1973). Thus, a key question for this Court is whether a birth parent's right to prevent an adult adoptee from accessing confidential adoption information, including the identity of the birth parent, is analogous to fundamental privacy and autonomy rights the Supreme Court and the Circuits have found elsewhere. *See, e.g., Moore v. City of East Cleveland, Ohio,* 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977) (familial right of privacy unduly burdened by zoning regulation that interfered with extended family members' ability to live under one roof); *Carey v. Population Services Int'l,* 431 U.S. 678, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977) (statute allowing only pharmacists to distribute contraceptives unduly burdens the "fundamental" privacy right to decide whether or not to procreate).

The Supreme Court has recognized that the familial rights to marry, establish a home, and raise children are fundamental privacy interests entitled to constitutional protection. *Prince v. Massachusetts,* 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944), *reh'g denied,* 321 U.S. 804, 64 S.Ct. 784, 88 L.Ed. 1090 (1944). Additionally, the Court has held that a woman's decision whether or not to carry a pregnancy to term is a protected, fundamental privacy right. *Roe v. Wade,* 410 U.S. at 152, 93 S.Ct. at 726. However, as shall be shown below, the disclosure of private information to adult adoptees under the Act is not sufficiently analogous to fundamental familial and reproductive privacy rights. Further, the Supreme Court and the Sixth Circuit do not recognize a right to the nondisclosure of personal information.

Plaintiffs assert that a familial right of privacy may be endangered under the statute by either siblings of adopted children seeking information about adoptive parents, or by adoptees seeking information about birth parents. (Memorandum in Support, p. 8). However, the Court finds that the Plaintiffs' claims are more accurately analyzed in terms of the release of confidential information, rather than in terms of familial privacy. The Act does not directly impinge upon birth parents rights to subsequently marry, have, and raise children as they see fit, or upon adoptive parents' right to raise their adoptive children as they see fit. Thus, the Act does not fall within the scope of a Constitutional

right to familial privacy and autonomy as defined by caselaw. *See, e.g. Loving v. Com. of Virginia,* 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967) (striking down law which prohibited interracial marriage); *Moore v. East Cleveland,* 431 U.S. at 494, 97 S.Ct. at 1933 (1977) (familial right of privacy unduly burdened by zoning regulation that interfered with the ability of extended family members to live under one roof); *Pierce v. Society of the Sisters of the Holy Names of Jesus and Mary,* 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925) (familial rights unduly burdened by law forbidding children's attendance at parochial schools). If the Act creates harm for the families of birth parents, and adoptive parents it is through the impact that the release of formerly confidential information will have upon the individuals within those families. However, the Act has mechanisms intended to address disruption of the families of birth parents and adoptive parents that may result from either unwanted contact, or the disclosure of any information gained under the Act to the public at large. Unwanted contact and disclosure of information gained under the Act are both criminalized under the new statute and its amendments, and may also give rise to civil damages. *See* T.C.A. § 36–1–132 (Public Chapter No. 1054, § 119, Public Chapter No. 1068, § 1). Moreover, regarding adoptive families, no information concerning an adopted child may be released unless that child is over age 21. Additionally, the Act intends to prevent the release of adoptive parents' confidential information by removing adoptive parents' home study documents from adoption files before the files are made available to those with access under the Act. T.C.A. § 36–1–102(7)(C) (Public Chapter 1054, § 7). Thus, the Court hopes that ultimately adoptive parents' and birth parents' fears will be largely ameliorated by the Act's provisions.

In addition to claiming that the Act interferes with Constitutionally protected familial privacy, Plaintiffs maintain that the new legislation interferes with their right to reproductive privacy. Specifically, they allege that "because parents rely on anonymity when deciding whether to carry a child to term and place it for adoption, the Act will cause more women to abort their babies." Pls. Memorandum in Support of Motion for a Temporary Restraining Order, Doc. No. 3, p. 10. Here, Plaintiffs conflate the decision as to whether to carry a pregnancy to term with the right to place a child for adoption. While the Supreme Court recognizes a woman's fundamental right of privacy regarding the termination of a pregnancy, neither the Supreme Court nor the Tennessee Supreme Court has found adoption to be a reproductive choice entitled to similar constitutional protection.

Once a woman decides to continue her pregnancy to term, she may decide to place the child for adoption. While the Act's provisions regarding access to information and potential future contact may impact a parent's decision to release a child for adoption, they do not interfere with a "reproductive right of privacy," since they fail to impinge upon a woman's right under the Act to carry a pregnancy to term.

In Tennessee, adoption was created by the state legislature through state statutes. *In re Adoption of Mullins,* 219 Tenn. 666, 412 S.W.2d 896 (1967). As caselaw and legislative history indicate, adoption developed in Tennessee to protect children's best interests in instances where birth parents were either unable or unwilling to take responsibility for their care. *Young v. Smith,* 191 Tenn. 25, 231 S.W.2d 365, 367 (1950); *Ex parte Wolfenden,* 49 Tenn.App. 1, 349 S.W.2d 713 (1961). Thus, under Tennessee state law, adoption is set up to protect predominantly children's interests.

The choice to surrender a child for adoption is undoubtedly a deeply personal, wrenchingly emotional decision. However, the Act is not intended to impact upon a woman's decision with respect to adoption. According to the Supreme Court, "Virtually every governmental action interferes with personal privacy to some degree. The question in each case is whether that interference violates a command of the United States Constitution." *Katz v. United States,* 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967). Since the Act does not prohibit adoption, it cannot be deemed analogous to

direct government restraints on private, fundamental decision making. Such restraints are embodied in laws that the Supreme Court has found unconstitutional, such as laws that criminalize abortion, *Roe,* 410 U.S. at 113, 93 S.Ct. at 707; prohibit interracial marriage, *Loving v. Virginia,* 388 U.S. at 1, 87 S.Ct. at 1818; outlaw married couples' use of birth control, *Griswold v. Connecticut,* 381 U.S. 479, 485, 85 S.Ct. 1678, 1682, 14 L.Ed.2d 510 (1965); or forbid children's attendance at parochial schools, *Pierce v. Society of Sisters,* 268 U.S. at 510, 45 S.Ct. at 571; however such restraints are not found in this case.

The Plaintiffs also argue on the basis of non-binding authority from other jurisdictions that biological parents have an expectation of privacy from disclosure of constitutionally protected confidential information. Plaintiffs cite *In re Assalone,* 512 A.2d 1383, 1386 (R.I., 1986), *Bradey v. Children's Bureau of South Carolina,* 275 S.C. 622, 274 S.E.2d 418 (1981) and *Alma Society, Inc. v. Mellon,* 601 F.2d 1225 (2nd Cir., 1979), *cert denied,* 444 U.S. 995, 100 S.Ct. 531, 62 L.Ed.2d 426 (1979) in support of this proposition. However, the cases cited by Plaintiffs are actions by adult adoptees attacking the constitutionality of state statutes limiting access to adoption records. In the cited cases, courts have upheld the statutes' constitutionality and states' legitimate public interests in maintaining these records' confidentiality, which provides a rational basis for the statutes. *Assalone,* 512 A.2d at 1390; *Bradey,* 274 S.E.2d at 421; *Alma Society,* 601 F.2d at 1235. Regarding the issue at hand, these cases acknowledge that the state legislature is the proper entity to decide whether it is in the public interest to change the procedure for releasing information in adoption records. *Id.* Additionally, some other courts have held that statutes governing the release of adoption records represent procedural issues which are for the legislature to decide and which do not affect any vested interests. *Application of Gilbert,* 563 S.W.2d 768, 770 (Mo.1978); *Matter of Linda F.M.,* 92 Misc.2d 828, 830, 401 N.Y.S.2d 960 (N.Y.Sur., 1978).

Plaintiffs also cite the United States Supreme Court's statement, in *Whalen v. Roe,* that a person has "an individual interest in avoiding the disclosure of personal matters," 429 U.S. 589, 599, 97 S.Ct. 869, 876, 51 L.Ed.2d 64 (1977), in arguing that there is a constitutional right to the nondisclosure of personal information. However, a close analysis of *Whalen* reveals that such an interest, while cognizable, does not rise to the level of a constitutionally protected right. *Id.* at 604, 97 S.Ct. at 878–79 (upholding the constitutionality of a New York law requiring that prescriptions of certain drugs be written in triplicate and reported to a state registry). The Supreme Court stated in *Whalen* that "[A]lthough the Constitution affords protection against certain kinds of government intrusions into personal and private matters, there is no general constitutional 'right to privacy.' ... [T]he protection of a person's general right to privacy ... is, like the protection of his property and his very life, left largely to the law of the individual states." *Id.* at 607–08, 97 S.Ct. at 880–81 (J. Stewart concurring, *citing Katz,* 389 U.S. at 350–51, 88 S.Ct. at 510–11).

In addition to Supreme Court authority, there is also Sixth Circuit caselaw addressing whether the disclosure of private information is constitutionally protected. *J.P. v. DeSanti,* 653 F.2d 1080, 1088–89 (6th Cir., 1981). The *DeSanti* court specifically held, regarding nondisclosure of juvenile court records, that constitutional privacy rights are restricted to "those rights that can be deemed 'fundamental' or 'implicit in the concept of ordered liberty,'" The Court also stated that the safeguards against the nondisclosure of private information "must be left to the state or the legislative process." *Id.* at 1090–91. The holding in *DeSanti* has been affirmed in subsequent decisions by the Sixth Circuit Court of Appeals. The Court recently found that there was no violation of a constitutional right of privacy in the disclosure of an inmate's HIV status. *Doe v. Wigginton,* 21 F.3d 733, 740 (6th Cir., 1994). Analogizing from these cases, the Plaintiffs' claim that the Act violates a birth parent's federal constitutional right to the nondisclosure of private information must fail.

Plaintiffs' rights under the Tennessee Constitution are similar to their rights under the United States Constitution. The

Tennessee Supreme Court, in *Davis v. Davis,* recognized a right to privacy in matters of "procreational autonomy," 842 S.W.2d 588, 600, (1992), *cert. denied* 507 U.S. 911, 113 S.Ct. 1259, 122 L.Ed.2d 657 (1993) similar to the zone of privacy in reproductive decision-making the Supreme Court upheld in *Roe* and *Griswold.* Also, like the United States Supreme Court, the Tennessee Supreme Court has never held that a general right to privacy extends to the nondisclosure of personal information, and any determination of such rights has been left to the legislature. Thus, under the Tennessee Constitution, there is no right to the nondisclosure of personal information, and Plaintiffs' Tennessee Constitutional claims cannot survive.

In addition to their claims regarding fundamental Constitutional privacy rights, the Plaintiffs also maintain that the Act violates their rights under the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution. Amended Complaint, Doc. No. 7, p. 14. Although they do not set forth their argument as to this cause of action in their Memorandum, their statements during oral arguments indicate their concern that the Act discriminates between those women in Tennessee who will opt for abortion and those women who will choose to carry a pregnancy to term and place the child for adoption under the new statutory scheme. The Act states that a woman who chooses to carry a child to term and surrender it for adoption may eventually have her identity and other personal, adoption-related information revealed to her child, or that child's representative. The Plaintiffs argue that since abortion related records are sealed there is no threat to women who opt for abortion under Tennessee state law that third parties could subsequently access private, abortion-related information.

To succeed in an equal protection claim, Plaintiffs must show that either (1) they have been burdened by state action because they are members of a suspect class or (2) that their fundamental constitutional rights have been burdened because they are a member of a government selected classification. Thus far, the Supreme Court has deemed only classifications based upon race and national origin as suspect. *City of Richmond v. J.A. Croson Co.,* 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989). Since women who surrender children for adoption under the Act are not categorized according to their race or national origin, and they have not been singled out to be deprived of their rights under color of state law, they are not a suspect class. Thus, the Plaintiffs cannot demand that the Court impose strict scrutiny on the Act.

In the absence of suspect classification, Plaintiffs might alternatively argue that birth mothers are a "semi-suspect" class. If these plaintiffs were deemed a semi-suspect class, the Court would apply middle-level scrutiny to the Act. To withstand middle-level scrutiny, the government must only demonstrate that the classification be "substantially" related to the achievement of an "important" government objective. *Craig v. Boren,* 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976), *reh'g denied,* 429 U.S. 1124, 97 S.Ct. 1161, 51 L.Ed.2d 574 (1977). However, the Act should withstand middle-level scrutiny, since making adoption records available to adult adopted persons with certain restrictions is substantially related to the State of Tennessee's stated objective of balancing the interests involved in administering adoption in Tennessee.

If a statutory classification burdens a fundamental right, the Court would apply strict scrutiny regardless of the characteristics of the people who are burdened. However, the Supreme Court has only acknowledged fundamental rights for equal protection purposes in a limited number of instances, including: (1) the right to vote, *Harper v. Virginia Board of Elections,* 383 U.S. 663, 667, 86 S.Ct. 1079, 1081–82, 16 L.Ed.2d 169 (1966); (2) the right to have access to the court, *Griffin v. Illinois,* 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956), *reh'g denied,* 351 U.S. 958, 76 S.Ct. 844, 100 L.Ed. 1480 (1956); and (3) the right to interstate migration. *Shapiro v. Thompson,* 394 U.S. 618, 630, 89 S.Ct. 1322, 1329, 22 L.Ed.2d 600 (1969). Because the Supreme Court has never recognized a claim similar to that brought by the Plaintiffs as a fundamental right for equal protection

purposes, the Plaintiffs' equal protection claim must fall.

**B. Risk that the Plaintiffs will Suffer Irreparable Harm:**

The Court acknowledges the concern and anxiety that some birth parents and adoptive parents will feel as a result of the passage of this statute. However, as indicated above, the Act contains a number of provisions intended to protect these groups from the majority of the consequences that might give rise to their fears.

The Act and its amendments have mechanisms intended to address disruption of the birth parents' families' lives that may result from either unwanted contact despite a contact veto, or the disclosure of any information gained under the Act to the public at large. Unwanted contact and disclosure of information gained under the Act are both criminalized under the new statute, and may also give rise to civil damages. *See* T.C.A. § 36–1–132 (Public Chapter No. 1054, § 119); and T.C.A. § 36–1–132 (Public Chapter No. 1068, § 1).

As noted above, Plaintiffs maintain that adoptive parents, such as Kimberly C. and Russ C., will be harmed if personal information maintained in their files is released under the Act, for example, to birth siblings of their adopted children. Memorandum in Support, p. 8. However, under the Act, no information concerning an adopted child may be released unless that child is over age 21. Further, under the Act, home study information obtained from adoptive parents is not contained in the information which would be made available to the limited group of persons able to access adoption files under the Act. T.C.A. § 36–1–102(7)(C) (Public Chapter 1054, § 7).

Plaintiffs argue that adoption agencies, such as Small World Ministries, Inc., will be adversely impacted by the legislation in that they will be forced to renege on prior assurances they provided to birth parents and adoptive parents regarding the records' confidentiality. Additionally, according to Plaintiffs, the new law will injure adoption agencies by discouraging birth parents from placing children for adoption. Regarding the former claim, as noted above, Tennessee State adoption procedures have never offered total confidentiality to birth parents. Under the former statutory scheme, adoptees were allowed access to their adoption records if they petitioned the courts and the court granted discretionary access. This process gave rise to variable, unpredictable results. Record of Adoption Commission, Exhibits A and B to Affidavit of Caprice East, Doc. No. 83. In fact, under the court discretionary procedure formerly in place, biological parents were not offered notice or an opportunity to be heard, and were not entitled to consideration on the question as to whether access would be permitted. Thus, an adoption agency's past assurances of confidentiality were either subject to these former statutory limitations, or erroneous.

Regarding the potential impact of the Act upon women's decisions as to whether to place children for adoption via Tennessee state agencies, the Court finds the Plaintiffs' claims to be speculative and a matter on which the proof should be further developed. Although Plaintiffs cite evidence derived from international sources in support of their claims, Plaintiff's Amended Complaint, Doc. No. 7, ¶ 23, Defendants and Amici also cite comparative evidence and analysis in their briefs and oral argument tending to undermine Plaintiffs' contentions. *See* Affidavit of Frederick F. Greenman, attached to Brief Amicus Curiae filed by Jim Holcomb, Joe Fowlkes, Caprice East, and Robert D. Tuke, Doc. No. 73. Thus, the Court finds that at this time it is not possible to accurately forecast the Act's impact upon Tennessee adoption agencies without further development of the evidentiary record.

**C. Injury to Plaintiffs Outweighing Potential Harm to Other Parties if the Preliminary Injunction is Not Granted and Public Interest in the Preliminary Injunction:**

The Court is aware that if a preliminary injunction is granted and the Act's enactment is delayed, numerous adult adoptees and birth parents will experience disappointment, frustration, and in some instances psycholog-

ical distress. *See* Memorandum and Affidavits of Amicus Curiae Teresa Evetts Horton, Kay Garrett, et. al. Doc. Nos. 12–70. The Court has granted Amicus Curiae status to a group of sixteen birth parents, five adoptive parents, and thirty-three adoptees who testify to their desire for access to records under the Act's terms in order to facilitate adoptees' and birth parents' coming to terms with their experiences. *Id.* Defendants have also made reference in oral arguments as to the many adult adoptees who came forward and expressed similar sentiments at statewide hearings held prior to the passage of this legislation. Additionally, medical and psychological experts have recognized the psychological needs of adult adoptees which can be assuaged through access to adoption records. *See* Jason Kuhns, *The Sealed Adoption Records Controversy: Breaking Down the Walls of Secrecy*, 24 Golden Gate U.L.Rev. 259, 271–274 (1994). When the harm which will, according to the testimony of the Amicus Curiae, befall adult adoptees, adoptive parents, and birth parents who favor the Act's passage if the statute is not enacted, is weighed against the Plaintiffs' injuries, the Court finds that, given the Act's present protective measures, the public interest favors a denial of the preliminary injunction.

The Court does not intend by this holding to belittle the concern or fears of birth parents and adult adoptees who do not wish to have contact with birth family from whom they have been separated by adoption. However the Court hopes and trusts that with the protection of the Act's criminal and civil sanctions against those who violate a contact veto or disclose to the public information acquired under the Act, the problems which give rise to such fears will not come to pass.

### CONCLUSION:

For the reasons discussed above, the Court concludes that Plaintiffs have failed to satisfy the stand for the issuance of a preliminary injunction. Accordingly, the Court hereby DENIES Plaintiffs' Motion for a Preliminary Injunction. The Court also DENIES the Plaintiffs' Motion to Consolidate the Prelimi-

nary Injunction Hearing with a Hearing on the Merits.

An order consistent with these findings is filed contemporaneously.