Suella DeBOLT, Plaintiff–Appellant,

v.

Michael ESPY, et al., Defendants–
Appellees.

No. 93–4023.

United States Court of Appeals,
Sixth Circuit.

Argued Nov. 9, 1994.

Decided Feb. 15, 1995.

Rehearing and Suggestion for Rehearing
En Banc Denied May 5, 1995.

Kalpana Yalamanchili (briefed), Ohio State Legal Services Ass'n, Columbus, OH, and Gary M. Smith (argued and briefed), Southeastern Ohio Legal Services, New Philadelphia, OH, for plaintiff-appellant.

John S. Koppel (argued), Michael Jay Singer, U.S. Dept. of Justice, Appellate Staff, Civ. Div.; Edward Swaine, and Jonathan Weinberg (briefed), U.S. Dept. of Justice, Civ. Div., Washington, DC, for defendants-appellees.

Edward G. Kramer (briefed), Stuart Reich (briefed), Kramer & Tobocman, Cleveland, OH, for amici curiae.

Before: BROWN, KENNEDY and SILER, Circuit Judges.

BAILEY BROWN, Circuit Judge.

The plaintiff in this case, Suella DeBolt, seeks a larger government-subsidized § 515 apartment to house her growing family. To accomplish this end, she brought a class action against the Farmer's Home Administration ("FmHA"), claiming that its policies encouraged private developers to construct and maintain small apartments for the elderly over large apartments for large families in violation of the Fair Housing Act's prohibition against family status discrimination. 42 U.S.C. §§ 3604, 3605, and 3608 (1989). She also claimed that the FmHA did not properly enforce its regulations concerning lease provisions and notices of termination. The district court denied the plaintiff's claims, and granted summary judgment for the FmHA. The plaintiff appealed. We conclude that the plaintiff is without standing to pursue all but one of her claims, and that this other claim is moot. Therefore, we AFFIRM the district court.

## I.

Under § 515 of the Rural Rental Housing Program, 42 U.S.C. § 1485 (1989), the FmHA provides low-interest loans to private developers willing to build and manage rural housing for the elderly, handicapped, or the poor. The FmHA also provides rental assistance for some of this housing, paying a portion of the tenant's rent.

Beginning in 1986, the plaintiff lived with her two children in a § 515 two-bedroom apartment at Village Green Apartments in Roseville, Ohio. She lived in an apartment for which she received rental assistance from the FmHA and paid only $11 per month in rent. In 1988, she had her third child, and in January of 1991, she had her fourth child. The landlord then attempted to evict her because, according to a lease provision, no more than four persons could live in her two-bedroom apartment. She challenged the

eviction, arguing that her termination notice and the manner of its delivery violated federal law. She then brought this lawsuit against Village Green Apartments, several other private defendants, and the FmHA. Village Green agreed to let her stay in the apartment for another year while they attempted to negotiate a settlement. In December of 1991, the plaintiff had her fifth child. In January of 1992, she settled the case with the private defendants, dropped her claims against them, and moved out of her apartment.

The plaintiff maintained her action against the FmHA, however, claiming in essence that the agency's § 515 housing policies favor the elderly at the expense of large families in violation of the Fair Housing Act. Specifically, she contends that the FmHA discriminates against large families by establishing incentives which encourage private developers to build small apartments where only the elderly and small families can live instead of large apartments where large families can live.[1] The plaintiff argues that private developers, who covet § 515 funding, respond to these incentives by invariably proposing small-apartment units, resulting in a glut of one and two bedroom apartments, and a dearth of three, four and five bedroom apartments.[2] If we were to simply order the FmHA to restructure its lending practices and "level the playing field" between the elderly and large families, the plaintiff asserts that private developers will respond to the changed incentives by building larger apartments, and she and her family will have a § 515 apartment in which to live.

In addition to this major claim, the plaintiff also contends that the FmHA violated its own regulations by not properly reviewing the plaintiff's notice of termination of her lease. Furthermore, the plaintiff argues that the FmHA failed to properly supervise its § 515 landlords and promulgated an illegal model lease agreement which resulted in the plaintiff's being subject to a month-to-month lease instead of a year-to-year lease.

The district court denied the plaintiff's claims, reasoning that large families are not a protected class under the Fair Housing Act, and that the "[p]laintiffs simply have no right to public housing, and the FmHA is not obligated to finance or compel private developers to build large apartment units." *Debolt v. Espy*, 832 F.Supp. 209, 215 (S.D.Ohio 1993). With regard to the plaintiff's termination notice and lease provision claims, the court held that the plaintiff lacked standing to raise the first issue, and that the second issue was moot because the FmHA had changed its model lease agreement. We will not address the merits of the plaintiff's claims because she lacks standing to pursue all but her last claim, and that claim is moot.

## II.

Under Article III of the United States Constitution, a court has no jurisdiction over a case when the plaintiff does not have standing. *Jaimes v. Toledo Metropolitan Housing Authority*, 758 F.2d 1086, 1092 (6th Cir.1985). Standing is determined by applying a three-part test: (1) has the plaintiff suffered a direct or imminent injury in fact? (2) is there a causal connection between the injury and the defendant's conduct, or was the injury caused by "the independent action of some third party not before the court?" and (3) is there a "likelihood that the injury will be redressed by a favorable decision?" *Northeastern Fla. Chapter of Associated Gen. Contractors v. City of Jacksonville*, —— U.S. ——, ——, 113 S.Ct. 2297,

---

1. The plaintiff contends that the following actions either facially discriminate against large families or have a disparate impact upon them: (1) the FmHA subsidizes the rental payments in elderly projects more than the rental payments in family projects; (2) the FmHA previously gave ten "priority points" to elderly-project proposals, but none to family-project proposals; (3) the FmHA uses a per-apartment-unit cost containment policy instead of a per-square-foot cost containment policy, resulting in smaller apartments; (4) the FmHA factors in the cost of managing the project in deciding whether to grant a loan, when projects containing small units cost less to manage than projects containing large units; and (5) when deciding to fund a project, the FmHA relies on the developer's market studies which invariably demonstrate a need for small rather than large apartment units.

2. The plaintiff points to the fact that Ohio has 13,075 § 515 apartments, and only 363 of these apartments contain three or four bedrooms.

2301, 124 L.Ed.2d 586 (1993). In order to bring a claim under the Fair Housing Act, a plaintiff need only fulfill the Article III standing requirements. *Trafficante v. Metropolitan Life Ins. Co.*, 409 U.S. 205, 209, 93 S.Ct. 364, 366–67, 34 L.Ed.2d 415 (1972). Thus, we have jurisdiction over the plaintiff's claim so long as she satisfies the three basic prerequisites of constitutional standing.

The plaintiff here is attempting to obtain § 515 housing by directly challenging the allegedly discriminatory actions of the FmHA, even though private developers are responsible for proposing, constructing, renting, and managing these apartment complexes. The plaintiff alleges that once the FmHA's discriminatory incentives are removed, private developers will construct the large apartments necessary to house her family. She thus conceives the FmHA's policies as the root cause of her injury. This case is therefore analogous to those housing cases where a plaintiff challenges the discriminatory actions of the government, when in actuality a third party is responsible for building, maintaining, or approving the low-income housing the plaintiff desires. *See, e.g., Village of Arlington Heights v. Metropolitan Hous. Dev.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); *Warth v. Seldin*, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *Jackson v. Okaloosa County, Fla.*, 21 F.3d 1531 (11th Cir.1994); *Jaimes*, 758 F.2d 1086; *Hope, Inc. v. County of DuPage*, 738 F.2d 797 (7th Cir.1984).

In *Warth v. Seldin*, the Supreme Court set out what a plaintiff must generally show in order to establish standing in this type of case. In *Warth*, the plaintiffs argued that the town's zoning ordinances prevented the construction of low-income housing, and thus discriminated against minorities in violation of the Fair Housing Act. The Court held that the plaintiffs did not have standing, reasoning that their injuries did not result from the discriminatory practices of the town's zoning commission, but rather from the independent acts of developers and builders. *Warth*, 422 U.S. at 504–05, 95 S.Ct. at 2208. The Court stated:

> Petitioners must allege facts from which it reasonably could be inferred that, absent the respondents' restrictive zoning practices, there is a substantial probability that they would have been able to [obtain housing] and that, if the court affords the relief requested, the asserted inability of petitioners will be removed.

*Id.* at 503, 95 S.Ct. at 2207. The Court further noted that even though two developers had attempted to build low income housing projects in the proscribed neighborhood, there was no showing that these projects "would have satisfied petitioners' needs at prices they could afford, or that, were the court to remove the obstacles attributable to respondents, such relief would benefit petitioners." *Id.* at 506, 95 S.Ct. at 2209.

In *Jaimes v. Toledo Metropolitan Housing Authority*, 758 F.2d 1086 (6th Cir.1985), a case involving a challenge to the practices of the Department of Housing and Urban Development ("HUD"), this court further expounded on the analysis set forth in *Warth*. The plaintiffs in *Jaimes* argued that the practices of HUD and the Local Housing Authority discriminated against minorities by concentrating public housing in minority areas and away from suburban areas. *Id.* at 1091. In denying the plaintiffs standing, we first noted that a plaintiff must show a likelihood or substantial probability that the defendant's policies caused his lack of housing and also that favorable action by the court would cure that lack of housing. *Id.* at 1095. We then held that in order to demonstrate this substantial probability, a plaintiff must generally show that a developer proposed a particular project in which the plaintiff would have lived, but that the proposal was denied due to the policies of the defendant. *Id.* at 1097. Otherwise, a plaintiff's claim is based on nothing more than "speculation and conjecture." *Id.* at 1096. Because the plaintiffs in *Jaimes* could point to no specific project, we held that they did not have standing.

■ In the present case, the plaintiff does not point to any particular large-family project to which the FmHA denied funding, much less a project in which she would have lived. Thus, even if we assume that failing to acquire a government-subsidized apartment is an "injury in fact," the plaintiff has failed to satisfy the causation and redressability

requirements necessary to establish standing. Indeed, the plaintiff virtually conceded the speculative nature of her claim at oral argument. In response to this court's question to counsel as to how he would write the order for his client detailing how the FmHA should proceed, plaintiff's counsel stated:

I think first [the FmHA] should level the playing field, so that developers have no disincentive to propose those projects that they want. And secondly, I think FmHA should propose a plan that includes its suggestions about what it thinks it should be doing under § 3608 to further access in the 515 program by families with children. *We would hope as a result,* that once the playing field was leveled, once the disincentives were removed, once FmHA starts taking seriously ... their obligations to families with children under the Fair Housing Act, that *the eventual result will be* that more three bedroom and four bedroom apartments exist in Ohio.

(Emphasis ours.) However, mere hope that the eventual result of "leveling the playing field" by the FmHA will be large apartments for large families does not demonstrate a substantial probability that the FmHA's lending practices either caused the shortage of large-family apartments, or that altering the FmHA lending practices would necessarily result in private developers proposing and building more large-family apartments.

At bottom, the plaintiff's cause of action rests on nothing but guesses as to how private developers respond to the incentives created by the FmHA's lending practices. However, the lack of large apartments could just as easily be a consequence of other factors, such as economic concerns regarding that particular housing market. *See Hope, supra,* at 811. Thus, the plaintiff in the present case has "alleged and proved nothing more than a remote probability that [her] situation might have been better had the [FmHA] acted otherwise and might improve were the court to afford relief." *Id.*

■ The plaintiff attempts to avoid the result compelled by the above authority by redefining her injury. She argues that her injury is not her lack of a government-subsidized apartment, but rather her inability to compete for apartments equally with the elderly and small families. She claims her injury is therefore similar to that discussed in the Supreme Court's recent decision in *Northeastern Fla. Chapter of Associated Gen. Contractors v. City of Jacksonville,* —— U.S. ——, 113 S.Ct. 2297, 124 L.Ed.2d 586 (1993). In that case, the Court held that the denial of equal treatment can on some occasions constitute an injury in fact:

When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier in order to establish standing. The "injury in fact" in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit.

*Id.* at ——, 113 S.Ct. at 2303. Thus, when the discriminatory actions of government officials cause a plaintiff's inability to compete on equal footing with others, then that inability is an injury in fact sufficient to create standing.

The plaintiff argues that her case fits within this holding because "families with children are denied a right to compete equally for § 515 housing and its attendant benefits because of access and developmental barriers created and maintained by FmHA's discriminatory housing practices." *Plaintiff's Reply Brief* at 4. However, even though the plaintiff is challenging the "developmental barriers" created by the FmHA's funding practices, she is not one of the parties competing for the FmHA's funds; private developers are. Thus, the plaintiff's inability to compete with the elderly and small families for § 515 housing is not directly caused by the FmHA's allegedly discriminatory practices, but rather by developers' decisions to build small apartments instead of large ones. Thus, even if the plaintiff redefines her injury as the "inability to compete equally," she has still not shown that the FmHA has caused this inability, or that we could redress it by granting her requested relief. *Cf. Si-*

*mon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 42, 96 S.Ct. 1917, 1926, 48 L.Ed.2d 450 (1976) (holding that indigent plaintiffs did not have standing to challenge a policy which allegedly encouraged private hospitals to deny them services). Regardless of how the plaintiff defines her injury, (either as the inability to obtain housing, or the inability to compete equally for housing), she has failed to demonstrate that the FmHA caused that injury, or that the requested relief would redress it. For this reason, we conclude that the plaintiff does not have standing to bring this claim.

### III.

In addition, the plaintiff also claims that the FmHA violated FmHA regulations by not properly reviewing her termination notice. The applicable regulation states that "[i]f the notice of termination fails to meet the technical requirements of preparation, the Servicing Official will ... [i]nform the borrower [i.e., landlord] to cease the [eviction and] [i]nform the borrower that it may reissue a new revised notice of termination if the borrower believes the conditions still warrant such action." 7 C.F.R. Part 1930, Subpart C, Exhibit B, ¶ XIV(D) (1994).

■ We believe the plaintiff also lacks standing to challenge this alleged violation. In short, the FmHA's failure to review her termination notice was not a cause of her eviction. The plaintiff was evicted because her family outgrew her apartment. She certainly cannot claim that she would have remained in her apartment if only the FmHA had discovered the technical flaws in the landlord's termination notice, for the regulation specifically states that the landlord "may reissue a revised notice if the borrower believes the action is still warranted." The plaintiff would have been evicted regardless of whether the FmHA properly reviewed her termination notice, and therefore, the plain-

tiff lacks standing to challenge this alleged FmHA violation.

### IV.

■ Lastly, the plaintiff contends that the FmHA encouraged landlords to violate the yearly lease regulation by promulgating a model lease agreement containing month-to-month rental terms. This placed any landlord relying on the FmHA's "model" lease to be in violation of an FmHA regulation requiring all leases to "cover a period of one year." 7 C.F.R. Part 1930, Subpart C, Exhibit B ¶ VIII(A)(1) (1994). According to the plaintiff's complaint, her landlord was one of those which used the model lease. In August of 1992, however, the FmHA promulgated a new model lease agreement actually complying with its own regulations. Any relief we might afford the plaintiff or the class in this regard has therefore been preempted by the agency, making the claim moot.[3]

### V.

For the reasons set out above, we AFFIRM the decision of the district court.

---

3. The plaintiff argues that this claim is not moot because over two thousand § 515 tenants are still subject to illegal lease agreements in violation of FmHA regulations. This is a claim a member of the plaintiff's class might want to make against those landlords using illegal leases, insofar as it is the § 515 landlords, "not FmHA, [who] are responsible ... for compliance with any loan or grant agreement or resolution, State laws, and other FmHA requirements." 7 C.F.R. § 1930.117(a)(2) (1994).