RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0118P (6th Cir.)
File Name: 03a0118p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

TERRI L. HAMAD et al.,
    *Plaintiffs-Appellants,*

*v.*

        Nos. 00-2502;
        02-1479

WOODCREST CONDOMINIUM
ASSOCIATION et al.,
    *Defendants-Appellees.*

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 00-72555—John Corbett O'Meara, District Judge.

Argued: March 11, 2003

Decided and Filed: April 22, 2003

Before: NELSON, COLE, and GILMAN, Circuit Judges.

———————————

### COUNSEL

**ARGUED:** Stephen M. Dane, COOPER & WALINSKI, Toledo, Ohio, for Appellants. Erik G. Chappell, LYDEN, LIEBENTHAL & CHAPPELL, Toledo, Ohio, for Appellees. **ON BRIEF:** Stephen M. Dane, Janet E. Hales, Meredith L. Mercurio, COOPER & WALINSKI, Toledo, Ohio, for

Appellants. Erik G. Chappell, LYDEN, LIEBENTHAL & CHAPPELL, Toledo, Ohio, for Appellees.

GILMAN, J., delivered the opinion of the court, in which COLE, J., joined. NELSON, J. (pp. 22-30), delivered a separate dissenting opinion.

———————————

### OPINION

———————————

RONALD LEE GILMAN, Circuit Judge. Kayla Joyella, Terri L. Hamad, and Akram Hamad brought suit against the Woodcrest Condominium Association, its property manager, and five members of its board of directors, alleging that Woodcrest's bylaws discriminated on the basis of familial status in violation of the Fair Housing Act, 42 U.S.C. §§ 3601-3619. Retaliation claims under the Act were added in an amended complaint. The district court denied Joyella's and the Hamads' motions for a preliminary injunction and for summary judgment, granted summary judgment against them on the discrimination claims, and granted judgment as a matter of law against them at the close of their case-in-chief on the retaliation claims. For the reasons set forth below, we **REVERSE** the judgment of the district court and **REMAND** the case for further proceedings consistent with this opinion.

### I. BACKGROUND

Woodcrest, a four-building, three-story condominium development, is located in Monroe, Michigan. In 1997, its bylaws prohibited families with children from purchasing or living in units on the second or third floors. The bylaws further provided that if a child moved in with a second- or third-floor owner, the owner would be fined if he or she did not vacate the unit within one year of the child's arrival.

Terri and Akram Hamad inquired about purchasing a unit in July of 1997. According to the Hamads, property manager

Barbara Diedrich told them about the bylaw restrictions and suggested that they purchase a first-floor unit if they "were even thinking about having children." They did in fact purchase a first-floor unit. When they had a child in 2000, they decided to move, despite not being required to do so. They attribute part of their difficulty in selling the unit to the bylaws that restrict children to first-floor condominium units.

Kayla Joyella owns a third-floor unit. She was thinking about becoming the legal custodian of her 15-year-old nephew and had taken preliminary steps toward that end in May of 2000. But the Woodcrest board of directors denied Joyella's request for permission to allow her nephew to move in with her.

In June of 2000, Joyella and the Hamads filed suit in the United States District Court for the Eastern District of Michigan against Woodcrest, property manager Barbara Diedrich, and five members of Woodcrest's board of directors. They challenged the bylaws as a violation of both the Fair Housing Act, 42 U.S.C. §§ 3601-3619, and of Michigan's Elliot-Larsen Civil Rights Act, Mich. Comp. Laws Ann. §§ 37.2101-37.2804. A preliminary injunction was also sought to enjoin enforcement of the bylaws.

Joyella and the Hamads amended their complaint two months later. The amended complaint omitted the earlier state-law cause of action, but added that the defendants had retaliated against Joyella and the Hamads for bringing the original suit under the Fair Housing Act. Both sides moved for summary judgment shortly thereafter. The motion by Joyella and the Hamads was limited to the issue of liability.

In November of 2000, the district court denied the motion for a preliminary injunction. Joyella and the Hamads timely filed a notice of appeal from this denial. In January of 2001, the district court entered an order that (1) denied the motion by Joyella and the Hamads for summary judgment, (2) granted the defendants' motion for summary judgment

against the Hamads on their discrimination claim, and (3) postponed a ruling on the motion for summary judgment against Joyella on her discrimination claim to allow her 45 days to "submit additional information . . . as to the status of her guardianship of [her nephew]." The court subsequently granted summary judgment against Joyella on the discrimination claim.

After the district court denied a motion by Joyella and the Hamads to file a second amendment to their complaint, trial commenced on the retaliation claims in February of 2002. The district court granted judgment as a matter of law in favor of the defendants at the close of Joyella's and the Hamads' case-in-chief. A timely notice of appeal was filed. Both this appeal and the appeal from the denial of Joyella's and the Hamads' motion for a preliminary injunction are now before us.

## II.  ANALYSIS

### A.  The district court erred in denying the motion for a preliminary injunction on the basis of standing

We review the denial of a motion for a preliminary injunction under the "abuse of discretion" standard. *United States v. 2903 Bent Oak Highway*, 204 F.3d 658, 665 (6th Cir. 2000). "A district court abuses its discretion when it applies the incorrect legal standard, misapplies the correct legal standard, or relies upon clearly erroneous findings of fact." *Schenk v. City of Hudson*, 114 F.3d 590, 593 (6th Cir. 1997). This standard "is a shorthand way of expressing the idea that this court ordinarily extends a high degree of deference to the district court's decision, but does so only if the district court properly understood the pertinent law and applied it in a defensible manner to the facts as they appear in the record." *2903 Bent Oak Highway*, 204 F.3d at 665.

A district court must assess four factors in deciding whether to issue a preliminary injunction: "(1) whether the plaintiff has established a substantial likelihood or probability of

success on the merits; (2) whether there is a threat of irreparable harm to the plaintiff; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by granting injunctive relief." *Nightclubs, Inc. v. City of Paducah*, 202 F.3d 884, 888 (6th Cir. 2000). "The four considerations applicable to preliminary injunction decisions are factors to be balanced, not prerequisites that must be met." *Mich. Bell Tel. Co. v. Engler*, 257 F.3d 587, 592 (6th Cir. 2001).

Perhaps following this court's statement that "[a]lthough no one factor is controlling, a finding that there is simply no likelihood of success on the merits is usually fatal," *Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000), the district court analyzed only the first factor. It denied the motion for a preliminary injunction on the basis that neither Joyella nor the Hamads had standing to sue under the Fair Housing Act.

The Fair Housing Act prohibits discrimination in the sale or rental of housing because of "race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604. Any "aggrieved person" is authorized to bring a civil action pursuant to 42 U.S.C. § 3613. The Act defines an "aggrieved person" as one who "(1) claims to have been injured by a discriminatory housing practice; or (2) believes that such person will be injured by a discriminatory housing practice that is about to occur." *Id.* § 3602(i). In deciding that the Hamads did not have standing to sue as "aggrieved persons," the district court reasoned: "[T]he Hamads live in and are attempting to sell a condominium unit that is on the first floor, one that may be purchased by families with children." As for Joyella, the court concluded that she too lacked standing because she did "not yet have legal custody of her minor nephew."

The Supreme Court has held, however, that standing to sue under the Act is "as broad as is permitted by Article III of the Constitution." *Gladstone, Realtors v. Vill. of Bellwood*, 441

U.S. 91, 109 (1979) (alteration omitted). Under the Fair Housing Act, a plaintiff thus need show only that he or she (1) has suffered an injury in fact (2) that is causally connected to the defendants' conduct and (3) that is likely to be redressed by a favorable ruling. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (holding that these three elements constitute the constitutional minimum for standing); *DeBolt v. Espy*, 47 F.3d 777, 779-82 (6th Cir. 1995) (applying these three factors to determine standing in a Fair Housing Act case).

The rationale on which the district court based its decision—that these requirements can be met only by persons who are directly and immediately subjected to discrimination—has been rejected by the Supreme Court. In *Trafficante v. Metropolitan Life Insurance Co.*, 409 U.S. 205 (1972), a black tenant and a white tenant of an apartment complex brought suit under the Fair Housing Act, alleging that their landlord racially discriminated against nonwhites. *Id.* at 206-07. The Court held that *both* tenants had standing because "the alleged injury to existing tenants by exclusion of minority persons from the apartment complex is the loss of important benefits from interracial associations." *Id.* at 209-10. "The person on the landlord's blacklist is not the only victim of discriminatory housing practices; it is . . . the whole community." *Id.* at 211 (internal quotation marks omitted).

Joyella has standing to challenge Woodcrest's bylaws, which facially discriminate on the basis of familial status, because they adversely affected her desire to have her teenage nephew move in with her, and because, given that Joyella could not sell her second-floor unit to a family with children, the bylaws diminished the number of potential buyers for her unit. The Seventh Circuit reached a similar conclusion in *Gorski v. Troy*, 929 F.2d 1183 (7th Cir. 1991). In *Gorski*, tenants who wanted to become foster parents sought permission from their landlord to have children live in their second-floor apartment, but the landlord refused, explaining that children were permitted only in first-floor apartments. *Id.*

at 1185.  The tenants were evicted when they sought to have the discriminatory policy changed.  *Id.*  In reversing the dismissal of the complaint, which the district court based on a lack of standing, the Seventh Circuit stated:

> Even if we assume, *arguendo*, that the Gorskis had not yet achieved "familial status" as that term is defined in the Act, the Troys' alleged actions, at the very least, still were discriminatory because the Troys expressed a preference for tenants on the basis of familial status in violation of section 3604(c) and, in violation of section 3617, retaliated against the Gorskis when the couple attempted to have the discriminatory policy changed. These activities clearly were the source of the Gorskis' alleged injury.

*Id.* at 1189-90.

Whether the Hamads have standing to challenge the bylaws is a more difficult question.  Because the Hamads lived in a first-floor condominium unit, the bylaws did not discourage them from having children, nor did the bylaws formally restrict the market of potential purchasers for the unit. Moreover, Woodcrest did not totally ban children from the premises.  It simply confined them to first-floor units.  The Hamads were thus not entirely deprived of the benefits to be derived from social associations with families having children.

In *Gladstone*, however, the Court held that the individual plaintiffs had standing because they "claimed to be injured as homeowners in the community against which petitioners' alleged [discriminatory practice] has been directed." 441 U.S. at 111.  *Gladstone* involved alleged racial discrimination by realtors in a particular neighborhood, but no allegations were made that the residents of the community had been completely deprived of the benefits of interracial associations. The plaintiffs' contention, rather, was that the "racial composition" of their neighborhood was "being manipulated."

*Id.* at 114.  In the Supreme Court's analysis, standing to challenge the alleged discriminatory practice did not turn on the manner or extent of the manipulation. *See Heights Comty. Cong. v. Hilltop Realty, Inc.*, 774 F.2d 135, 139 (6th Cir. 1985) (rejecting the argument that the case should be dismissed on standing grounds where the realtors argued that the City of Cleveland Heights and the nonprofit advocacy organization had failed to prove at trial that city residents were being deprived of the benefits of interracial associations, despite the realtors' contention that "the City was relatively stable racially when the alleged violations occurred, and . . . the City failed to prove any connection between any of the alleged violations and any threatened resegregation") (internal quotation marks omitted).

Instead, standing depends on whether one is a member of the community in which allegedly unlawful discrimination is taking place.  The Supreme Court applied this principle in *Gladstone* by holding that the plaintiffs who "claimed to be injured as homeowners in the community" had standing, 441 U.S. at 111, whereas the plaintiffs who were not members of the affected community did not, *id.* at 112 n.25 ("[N]either respondent Perry nor respondent Sharp resides within the target neighborhood of Bellwood.  We read the complaints as claiming injury only to that area and its residents . . . . On the record before us, we therefore conclude that summary judgment as to these two respondents was appropriate.").

Similarly, the Hamads alleged that they were members of a community whose familial-status composition was being manipulated.  Analogous to the plaintiffs in *Gladstone*, the Hamads were not completely deprived of the benefits to be derived from social associations with families having children, but, as residents of Woodcrest, they suffered the stigmatic harm of living in a community whose members were segregated on the basis of a prohibited classification. *See Trafficante*, 409 U.S. at 208 (recognizing, as part of the injury that conferred standing on the plaintiffs, that "they had suffered embarrassment and economic damage in social,

business, and professional activities from being 'stigmatized' as residents of a 'white ghetto'").  The dissent disagrees with this analogy, citing the *Gladstone* Court's statement that "[a] 'neighborhood' whose racial composition allegedly is being manipulated may be so extensive in area, so heavily or even so sparsely populated, or so lacking in shared social and commercial intercourse that there would be no actual  injury to a particular resident." 441 U.S. at 114. (Dissenting Op. at 26) Although this point might well apply to bar a homeowner living in, say, Chicago from challenging Woodcrest's bylaws by defining his or her "neighborhood" as the Midwest, it surely does not apply to the owners of condominium units in a four-building development.

The dissent also argues that Joyella and the Hamads failed to plead the precise nature of the harm that they suffered as homeowners in the community.  (Dissenting Op. at 26) Injury, however, is not a matter that must be pled with particularity. *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513 (2002) ("Rule 8(a)'s simplified pleading standard applies to all civil actions, with limited exceptions.").  In any event, the touchstone for standing under the Fair Housing Act is whether one is a member of the community in which allegedly unlawful discrimination is taking place, and Joyella and the Hamads clearly alleged that they were residents of Woodcrest.

We are also unpersuaded by the dissent's contention that Joyella and the Hamads lacked standing because they failed to offer evidence that they suffered any of the stigmatic or economic harm associated with membership in a community whose familial-status composition was being manipulated. (Dissenting Op. at 27-28)  Binding circuit precedent is to the contrary. *Heights Comty. Cong.*, 774 F.2d at 139 (holding that members of the community in which allegedly unlawful discrimination was taking place had standing to sue because, as members of the community, they were threatened with the stigmatic and economic harm attendant to proscribed

segregation, even if they did not introduce evidence that they suffered such harm).

The jurisprudence of the Supreme Court and this court on standing to sue for discrimination under the Fair Housing Act was developed before Congress amended the Act in 1988 to include "familial status" as a proscribed classification. Perhaps for this reason, we have found no precedent that directly addresses the standing to sue of persons in a community where segregation is taking place floor-by-floor rather than by building or area.  We have no difficulty concluding, however, that, had the Supreme Court  in *Trafficante* and *Gladstone* been faced with allegations that the plaintiffs lived in a community where white residents were permitted to live on any floor, but black residents were restricted to the first floor, the Court would have found that all persons in the community would have had standing to sue for a violation of the Fair Housing Act.  *See Gladstone*, 441 U.S. at 113 ("Petitioners suggest that there is a critical distinction between an apartment complex, even one as large as that in *Trafficante*, and a 12- by 13-block residential neighborhood. Although there are factual differences, we do not view them as controlling in this case.") (footnote omitted).  We therefore conclude that the allegations of the Hamads  in  this  case  were  sufficient  to  satisfy  the constitutional standing requirements.

The district court in the present case, in reaching a contrary conclusion, relied principally upon *Fair Housing Congress v. Weber*, 993 F. Supp. 1286 (C.D. Cal. 1997). In *Fair Housing*, the "defendants argue[d] that the individual plaintiffs were not themselves steered.  Plaintiffs concede[d] that this is so; as a result, the [two individual plaintiffs] lack[ed] standing as 'aggrieved persons' who may file suit under 42 U.S.C. § 3613 to remedy housing discrimination." *Id.* at 1294. "Steering" is the practice of directing seekers of housing away from certain locations for the purpose of maintaining patterns of segregation.  *Heights Comty. Cong.*, 774 F.2d at 139-40 (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 366

n.1 (1982)).   The decision in *Fair Housing* strikes us as inconsistent with the holdings in *Trafficante* and *Gladstone*. 409 U.S. at 208-11; 441 U.S. at 111-14.   In any event, the reasoning of the *Fair Housing* court is not applicable to the instant case because none of Joyella's claims and only one of the Hamads' claims is premised upon unlawful steering.

Because the district court in the present case denied the preliminary injunction exclusively on the rationale that Joyella and the Hamads lacked standing, and because it did not apply the correct law of standing under the Fair Housing Act, we conclude that the court abused its discretion in denying the preliminary injunction on that basis.   The question now is how to proceed.   Joyella and the Hamads argue that there is no need to remand for further proceedings on the preliminary-injunction issue.   Instead, they assert, this court should issue the injunction itself.

There are two reasons, however, why such a course is not appropriate in this case.   First, the balancing of preliminary-injunction factors is a task entrusted to the sound discretion of the district court.   *McPherson v. Mich. High Sch. Athletic Ass'n, Inc.*, 119 F.3d 453, 459 (6th Cir. 1997) (en banc) ("These factors simply guide the discretion of the court . . . . [T]he district court's weighing and balancing of the equities of a particular case is overruled only in the rarest of cases.") (internal quotation marks omitted).   When we do find an abuse of discretion, this court typically vacates or reverses the improper denial of a preliminary injunction and remands for further consideration.   *E.g., G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994); *see also* 11A Charles Alan Wright et al., Federal Practice and Procedure § 2962, at 448 (2d ed. 1995) ("In general, when the appellate court determines that the trial court's order denying injunctive relief was erroneous, it will reverse and remand the case for further proceedings below.").

The second reason for us not to balance the preliminary-injunction factors is because the parties have indicated in their

appellate briefing that, subsequent to the district court's denial of the preliminary injunction, the defendants entered into an agreement with the United States Department of Justice to no longer enforce the challenged policies.   Claims by Joyella and the Hamads for injunctive relief—at least those claims seeking to enjoin enforcement of the bylaws—may therefore be moot.   *See Detroit Fire Fighters Ass'n, Local No. 344 v. Dixon*, 572 F.2d 557, 559 (6th Cir. 1978) (per curiam) (holding that a request for injunctive relief was rendered moot where "two final non-appealable orders from state courts in Michigan enjoin[ed] on independent state law grounds the same conduct enjoined by the Court below on constitutional grounds").   *But see Hamad v. Woodcrest Condo. Ass'n*, Nos. 00-2502, 02-1479 (6th Cir. June 17, 2002) (order) (noting that Joyella and the Hamads "are also appealing the denial of injunctive relief against future acts of retaliation. . . . We cannot conclude that the plaintiffs' appeal in 00-2502 is moot.").   Under these circumstances, we believe that the prudent course is to allow the district court to determine in the first instance whether injunctive relief remains appropriate under the correct legal standard.

**B.   The district court erred in granting the defendants' motion for summary judgment on the Fair Housing Act claims of Joyella and the Hamads**

We review the district court's grant of summary judgment de novo.   *Sperle v. Mich. Dep't of Corr.*, 297 F.3d 483, 490 (6th Cir. 2002).   Summary judgment is proper where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.   Fed. R. Civ. P. 56(c).   In considering such a motion, the court construes all reasonable factual inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).   The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

Joyella and the Hamads argue that the district court erred in granting the defendants' motion for summary judgment on their discrimination claims. At oral argument on the motions, the district court stated that it was granting "Defendant[s'] motion for summary judgment, insofar as it applies to the Hamads, who the Court rules, as a matter of law, have no standing to maintain this lawsuit based upon their—as I understand it, their residency and sentence [sic] of the offense in relationship to the policies in the Woodcrest Condominiums Association." The court subsequently stated that it was dismissing Joyella's discrimination claim because she "lack[ed] standing as an 'aggrieved person' under the FHA."

As explained in Part II.A. above, however, the district court did not apply the correct law of standing under the Fair Housing Act. This means that the court never reached the question of whether genuine issues of material fact exist regarding the substantive allegations raised by Joyella and the Hamads. We find that the appropriate action, under these circumstances, is to reverse the district court's grant of summary judgment and remand for further consideration. *McCurdy v. Montgomery County*, 240 F.3d 512, 520 (6th Cir. 2001) (reversing and remanding for further proceedings a district court's grant of summary judgment where the lower court had erred in its application of the law of qualified immunity and therefore had not yet had an opportunity to consider whether material facts were in dispute).

Finally, the defendants contend that the agreement with the United States Department of Justice, noted in Part II.A. above, renders the entire case moot. We disagree. "Irrespective of the issue of injunctive relief, [Joyella and the Hamads] continue to seek damages to redress alleged violations of the Fair Housing Act. . . . Given [their] continued active pursuit of monetary relief, this case remains 'definite and concrete, touching the legal relations of parties having adverse legal interests.'" *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 371 (1982); *see also Harris v.*

*Itzhaki*, 183 F.3d 1043, 1050 (9th Cir. 1999) (rejecting the contention that more recent Supreme Court precedent undermines this conclusion in the context of claims under the Fair Housing Act).

**C. The district court should reconsider the motion by Joyella and the Hamads for partial summary judgment**

Joyella and the Hamads also appeal the district court's denial of their motion for partial summary judgment as to liability on their discrimination claims. "A district court's denial of summary judgment is an interlocutory order that is not ordinarily appealable." *Thomas v. United States*, 166 F.3d 825, 828 (6th Cir. 1999). "Where, however, an appeal from a denial of summary judgment is presented in tandem with a grant of summary judgment, this court has jurisdiction to review the propriety of the district court's denial of summary judgment." *Garner v. Memphis Police Dep't*, 8 F.3d 358, 363 (6th Cir. 1993). This court has held that in such a situation, "[w]here a motion for summary judgment is denied on the grounds that there exists a genuine issue of material fact, review of this ruling is under the abuse of discretion standard. Where, however, a denial of summary judgment is based solely upon legal grounds, review is de novo." *Id.* (citation omitted).

The district court did not set forth its reasons for denying the motion by Joyella and the Hamads for partial summary judgment, but presumably did so because it concluded that they lacked standing. As explained above in Part II.B., this means that we do not know whether genuine issues of material fact remain. Counsel for Joyella and the Hamads professed during oral argument that the parties were in agreement that no disputed factual issues exist. But the record is not so clear on this issue. Indeed, in opposing the motion for partial summary judgment below, the defendants at least purported to raise factual disputes. We therefore

reverse the denial of the motion for partial summary judgment and remand for further consideration.

**D.  The district court erred in granting judgment as a matter of law in favor of the defendants on the retaliation claims of Joyella and the Hamads**

A district court's decision to grant judgment as a matter of law is reviewed de novo. *Diamond v. Howd*, 288 F.3d 932, 935 (6th Cir. 2002). Judgment as a matter of law is appropriate where, after a party has been fully heard on an issue, "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Fed. R. Civ. P. 50(a). In making this determination, the court must view the evidence in the light most favorable to the nonmovant. *Diamond*, 288 F.3d at 935.

Pursuant to 42 U.S.C. § 3617, it is "unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed" his or her rights under the Fair Housing Act. This section reaches "actors who are in a position directly to disrupt the exercise or enjoyment of a protected right and exercise their powers with a discriminatory animus." *Mich. Prot. & Advocacy Serv., Inc. v. Babin*, 18 F.3d 337, 347 (6th Cir. 1994).

Joyella and the Hamads alleged in their amended complaint that the defendants had unlawfully retaliated against them for the filing of their initial complaint. After Joyella and the Hamads presented their retaliation claim to the jury, the district court granted a motion by the defendants for judgment as a matter of law. The court concluded that there was "no sufficient evidence upon which a reasonable jury could find, first of all, that there was any illegal retaliatory action which can be attributed to the defendants here." It further determined that there was "no evidence of legally cognizable injuries." We believe that the record clearly refutes these rulings by the district court.

Terri Hamad introduced into evidence a letter dated June 27, 2000 from Woodcrest's property manager and the majority of its board of directors to Terri Hamad's employer, the Monroe County Board of Commissioners, complaining that Hamad had filed the instant lawsuit and asking the Commissioners to "do whatever you can to eliminate this situation." Hamad also testified that, although she and her husband had attended Woodcrest Condominium Association meetings prior to the filing of this suit, they were asked to leave (presumably by the defendants) when they attended a meeting after the suit had been filed. In a similar vein, Joyella testified that after the lawsuit had been filed, the defendants took action against her for allegedly violating several condominium rules, even though, when Joyella had conducted herself the same way before the lawsuit, the defendants had taken no action.

When viewed in the light most favorable to the nonmovants, the above evidence is sufficient to raise a jury question on the retaliation claims. *See United States v. City of Birmingham*, 727 F.2d 560, 563 (6th Cir. 1984) (affirming the district court's finding that the city violated § 3617 of the Fair Housing Act where the "City Commission took action that supported opponents of the Baldwin House proposal [for low-income housing] by agreeing to defer a final vote on extending the Baldwin House contract and by adding several amendments to the proposed contract that made it impossible for Baldwin House to continue its negotiations successfully with [the state financing agency]"); *San Pedro Hotel Co. v. City of Los Angeles*, 159 F.3d 470, 473 (9th Cir. 1998) (holding that a genuine issue of material fact existed on the plaintiff's retaliation claim where the plaintiff had introduced evidence that, several weeks after publicly stating "that the City had acted illegally by refusing to fund housing for the mentally ill and that his family would sue[,] . . . the City of Los Angeles Building and Safety Commissioner and several members of the City's 'Slumhouse Task Force' conducted an inspection" of the plaintiff's hotel, cited him for violations, and gave him only a short time to make repairs) (footnote

omitted). The dissent reaches the contrary conclusion only by reviewing the evidence and drawing inferences in the light most favorable to the movants. This strategy is impermissible in considering whether a party is entitled to judgment as a matter of law under Rule 50. *Diamond*, 288 F.3d at 935 (holding that the evidence must be viewed "in the light most favorable to the *nonmovant*") (emphasis added).

The defendants, however, urge us to affirm the district court's judgment on the alternative rationale that Joyella and the Hamads did not produce any "evidence of legally cognizable injuries." But if the jury determines that the defendants violated the Fair Housing Act, then Joyella and the Hamads need to prove only that they "suffered a non-quantifiable injury at the hands of [the] defendants [to] justify [an] award of nominal damages." *Heights Comty. Cong. v. Hilltop Realty, Inc.*, 774 F.2d 135, 144 (6th Cir. 1985). Because Joyella and the Hamads introduced sufficient evidence to create a jury question as to whether the defendants violated § 3617, the plaintiffs' retaliation claims should have been submitted to the jury, which could have awarded nominal damages, at a minimum, upon a finding in their favor.

**E.   The district court should reconsider the motion of Joyella and the Hamads to amend their complaint**

On August 13, 2002, Joyella and the Hamads sought leave to file a second amendment to their complaint. The principal allegation of the proposed second amendment was that "[o]ther retaliatory acts engaged in by Defendants and directed at Plaintiffs after the filing of this lawsuit also constitute coercion . . . ." Leave to file this second amended complaint was denied by the district court.

Rule 15(a) of the Federal Rules of Civil Procedure provides that leave to amend a complaint "shall be freely given when justice so requires." This court will reverse the denial of a motion for leave to amend only if the district court has abused

its discretion. *Begala v. PNC Bank, Ohio, Nat'l Ass'n*, 214 F.3d 776, 783 (6th Cir. 2000). "A district court abuses its discretion when it applies the incorrect legal standard, misapplies the correct legal standard, or relies upon clearly erroneous findings of fact." *Schenk v. City of Hudson*, 114 F.3d 590, 593 (6th Cir. 1997).

The district court in this case gave three reasons for its refusal to allow the amendment. First, it observed that "the timing of Plaintiffs' request in this case is significant, as it was made after discovery has closed, after the deadline for dispositive motions has passed, and only a month before trial." But the record does not reflect that any scheduling order was ever entered. The factual findings that discovery had closed and that the deadline for dispositive motions had passed were therefore clearly erroneous.

Second, the district court noted that "Plaintiff[s] could have added the amendments when they filed the First Amended Complaint, the main purpose of which was to add a retaliation claim." But Joyella and the Hamads argued both below and on appeal that the purpose of the second amendment was to include actions undertaken by the defendants *after* the first amended complaint had been filed. We therefore conclude that this rationale for denying the plaintiffs' motion to file a second amended complaint is unpersuasive.

The district court's final consideration was that the allegations contained in the second amendment were vague and would therefore unduly prejudice the defendants. Although this is the type of discretionary judgment that could justify a refusal to allow leave to amend, *Foman v. Davis*, 371 U.S. 178, 182 (1962), we have no way to determine the extent to which the district court's ruling was influenced by the clearly erroneous factual findings discussed above. Because the district court based its decision in part on these erroneous factual findings, we reverse the court's denial of Joyella's and the Hamads' motion for leave to amend their complaint and remand the matter for further consideration.

**F. Evidentiary issues at trial are entrusted to the sound discretion of the district court**

During the trial of their retaliation claims, Joyella and the Hamads sought on several occasions to examine witnesses or introduce evidence concerning the defendants' financial resources and assets, but the district court refused to permit them to do so. Joyella and the Hamads ask this court to instruct the district court to allow such examination and evidence.

Evidentiary decisions are entrusted to the sound discretion of the trial court. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 141 (1997). We are therefore reluctant to micromanage how and when certain types of evidence should be introduced at trial. Because Joyella and the Hamads imply that the district court was laboring under an erroneous understanding of the standard for punitive damages under the Fair Housing Act, however, we simply note that the proper standard "is whether the defendants acted with malice or reckless indifference that their actions might violate a federal statute of which they were aware." *Preferred Props., Inc. v. Indian River Estates, Inc.*, 276 F.3d 790, 800 (6th Cir.) (internal quotation marks omitted) (adopting this standard for punitive damages in Fair Housing Act cases), *cert. denied*, 122 S. Ct. 2663 (2002).

**G. This case should not be reassigned to a different judge upon remand**

Joyella's and the Hamads' final request is that we reassign their case to a different judge upon remand. Although we have the authority pursuant to 28 U.S.C. § 2106 to remand the case to a different district judge, "this is an extraordinary power and should rarely be invoked . . . . Such reassignments should be made infrequently and with the greatest reluctance." *Armco, Inc. v. United Steelworkers of Am.*, 280 F.3d 669, 683 (6th Cir. 2002) (alteration in original). Joyella and the Hamads have not submitted proof of personal bias that would

require recusal under 28 U.S.C. § 144. We therefore evaluate their request by considering the following three factors:

(1) whether the original judge would reasonably be expected upon remand to have substantial difficulty in putting out of his or her mind previously[]expressed views or findings determined to be erroneous or based on evidence that must be rejected, (2) whether reassignment is advisable to preserve the appearance of justice, and (3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness.

*Brown v. Crowley*, 312 F.3d 782, 792 (6th Cir. 2002).

Joyella and the Hamads argue that the claims and defenses in this case are uncomplicated, so that a new judge could familiarize himself or herself with the case quickly and easily. This argument, however, is refuted not only by the extensive joint appendix and hundreds of pages of briefs filed on appeal, but also by the plaintiffs' own statement in support of oral argument that "[t]his appeal involves a fully[]developed and complex factual record." Comments made by the district court in this case, moreover, do not undermine the appearance of justice. In support of their argument that the district court was, or appeared to be, swayed by his personal views, rather than by the law, Joyella and the Hamads cite several comments that the district judge made during the course of the proceedings.

As an example of the judge's alleged predilection against their claims, they quote his remark that, in contrast to race discrimination, "we're notionally in a different area when you begin to talk about" discrimination on the basis of familial status. But the district judge completed the remark by recognizing that "Congress has commanded that . . . [a]nd if they have, we better enforce the law." Joyella and the Hamads also quote the district court's comment a few moments later that "[m]aybe that's the law, but I'm saying . . .

I don't know that should be the law."  The very next sentence uttered by the district judge, however, was: "But I'm very much convinced about the fact that I don't make the laws so I, we are trying to find out what laws are there and what laws I must enforce."  Thus, when considered in context, these comments do not demonstrate that the district judge was partial or that he could not put aside his personal views.

The district court clearly erred in its application of the law of standing under the Fair Housing Act to the facts of this case.  Neither the comments nor the conduct of the judge, however, establishes that he would not be able to decide fairly this factually complicated case upon remand.  We therefore decline to reassign this case to a different district judge.

## III.   CONCLUSION

For all of the reasons set forth above, we **REVERSE** the judgment of the district court and **REMAND** the case for further proceedings consistent with this opinion.

—————————

## DISSENT

—————————

DAVID A. NELSON, Circuit Judge, dissenting.  If the plaintiffs suffered any palpable injury in what the district court accurately characterized as their "neighborhood fight," it does not seem to me that the injury was the result of any violation of the Fair Housing Act. On the record before us, I believe that the defendants were entitled to summary judgment on the "familial status" discrimination claims, just as I believe they were entitled to judgment as a matter of law on the retaliation claims.  Accordingly, and because I am not persuaded that the district court abused its discretion in denying  leave to amend the complaint, I would affirm the district court's disposition in all respects.

I

It may be helpful to take a brief look at the factual context in which this lawsuit arose.  The opening salvo of the battle seems  to have been fired in September of 1999, when plaintiff Terri Hamad sent a letter to members of the condominium association detailing a series of complaints against the association's board of directors.

Signing her letter as "Owner #57 and Director, Monroe County Commission on Aging," Mrs. Hamad complained that the board had attempted to prevent an elderly co-owner (an 87-year-old widow, according to subsequent newspaper accounts) from arranging for bus service at the door of her building.  Mrs. Hamad's letter said that the board had "threatened Lake Erie Transit with a lawsuit if they enter the drive to pick up the co-owner."

This litigation threat was the product of a board meeting held without the knowledge of association members and in violation of the association's bylaws, according to Mrs.

Hamad. Decisions by the board to spend money on certain physical improvements were also said to have been taken without the knowledge and approval of the association's members. Finally, Mrs. Hamad wrote, "again without our knowledge, preparations are being made to turn this complex into a 50+ complex." Although the rule limiting families with children to first-floor units had been in effect for over a decade, Mrs. Hamad made no mention of the first-floor rule in her letter.

Mrs. Hamad also sent a letter to the editor of a local newspaper, describing the board's refusal to allow buses on Woodcrest's driveway as "disgusting," "disrespectful," and "illegal." The newspaper declined to publish the letter, but ran a feature article on the "battle over buses." Mrs. Hamad later testified that she had sought publicity of the busing issue in an effort to "expose the board and embarrass them publicly."

In October, Mrs. Hamad filed a complaint with the Michigan Department of Consumer and Industry Services alleging that Woodcrest's property manager had received an illegal "referral fee" from a real estate broker. The Department eventually concluded that the allegation could not be substantiated.

The next month, in her capacity as director of the county commission on aging, Mrs. Hamad complained to the Michigan Civil Rights Commission of several "Fair Housing Issues" at Woodcrest. These included "[i]ntimidation and harassment" of the elderly widow who sought bus service at her door[1] and the holding of board meetings without notice to the residents. Mrs. Hamad also complained, for the first time, that "[f]amilies with children are limited to first floor

condos." She later wrote to a member of the Michigan legislature for help "regarding the bus situation at Woodcrest."

In April of 2000, the president of the board of the condominium association wrote to the county commissioners to protest the actions of the commission on aging with respect to the busing issue. The letter posed the question, "Why did the Monroe County Commission on Aging champion the cause and concern of one resident while ignoring the concerns of the remaining senior residents?"

In May of 2000, plaintiff Kayla Joyella distributed a letter to other Woodcrest owners "to make sure all owners are aware of the recent conduct [of] board members [and the property manager] . . . ." The letter began with a reference to the "referral fee" that Mrs. Hamad had reported to the Michigan Department of Consumer and Industry Services, and the letter went on to recommend that other owners contact their title companies to determine whether similar fees had been paid at their closings. Ms. Joyella then complained that she was treated rudely when she asked the property manager about the bylaw limiting children to first-floor units. Ms. Joyella's letter suggests that she did not intend, at that time, to seek permission to have her nephew live with her. Her only reason for wanting to see the bylaw, her letter says, was to make a copy to show to her nephew "so he would know it wasn't that she did not want him, but she had to honor the rules."

The board and property manager distributed a letter of their own rebutting the points raised in Ms. Joyella's letter. The board also circulated a portion of the minutes from a board meeting of May 23, 2000, where Ms. Joyella had asked board members to sign a document stating that her nephew could not move in with her. According to the minutes, the meeting included "[m]uch heated discussion . . . concerning [Ms. Joyella's] letter and its contents that included liable [sic] and slanderous remarks." It is important to note that the "heated

---

[1]In a lengthy follow-up article on the bus dispute, the newspaper quoted Mrs. Hamad as saying that the board's action "is wrong, and it needs to be stopped. We've even called for a police escort for the bus if we need one."

discussion" did not concern the first-floor rule or the board's enforcement of it.

Prior to the filing of their lawsuit, to summarize, Mrs. Hamad and Ms. Joyella were both embroiled in emotionally-charged disputes with the board. Mrs. Hamad's complaints against the board related primarily to the busing issue; she raised the issue of discrimination against families with children only incidentally. Ms. Joyella's complaints focused on her treatment by the property manager and board members, not on her inability to have her nephew live with her. It was against this background that the Hamads and Ms. Joyella filed their lawsuit under the Housing Act in June of 2000.

## II

The Supreme Court has made it clear that standing to sue under the Housing Act is as broad as Article III of the Constitution permits. See *Gladstone, Realtors v. Bellwood*, 441 U.S. 91, 109 (1979); *Trafficante v. Metropolitan Life Ins. Co.*, 409 U.S. 205, 209 (1972). But, of course, it can be no broader. Like any other plaintiff, a plaintiff suing under the Housing Act must satisfy the constitutional requirement of "injury-in-fact;" *i.e.*, he must have suffered "'a distinct and palpable injury to himself' . . . that is likely to be redressed if the requested relief is granted." *Gladstone*, 441 U.S. at 100 (quoting *Warth v. Seldin*, 422 U.S. 490, 501 (1975)).

I am not persuaded that injury-in-fact necessarily resulted from the plaintiffs' having resided in a condominium complex with a presumably illegal first-floor rule. *Gladstone* and *Trafficante* do establish that a resident of a community need not be a target of illegal discrimination in order to be injured by it. See *Gladstone*, 441 U.S. at 411-14; *Trafficante*, 409 U.S. at 209-11. As I read these cases, however, they do not establish that every discriminatory policy necessarily injures every resident of the community where the policy exists.

For one thing, the Supreme Court in *Gladstone* expressly recognized that residents' standing to protest discrimination

within their community depends on "the presence of absence of a 'distinct and palpable injury.'" *Gladstone*, 441 U.S. at 114 (quoting *Warth*, 422 U.S. at 501). The Court noted that

> "[a] 'neighborhood' whose racial composition allegedly is being manipulated may be so extensive in area, so heavily or even so sparsely populated, or so lacking in shared social and commercial intercourse that there would be no actual injury to a particular resident." *Id.*

This observation cannot be squared with the notion that injury-in-fact is necessarily suffered by every resident of a community where discrimination is taking place.

*Gladstone* and *Trafficante* involved racial discrimination, moreover, and the Supreme Court expressly relied on "the importance of the 'benefits from interracial associations'" in concluding that the challenged discriminatory practices harmed residents who were not the targets of discrimination. *Gladstone*, 441 U.S. at 112 (quoting *Trafficante*, 409 U.S. at 210). Whether the benefits of allowing children on every floor of a condominium complex are as important as the benefits of racial integration remains an open question, I believe.

Given these considerations, it is appropriate to take a close look at the particular injuries the plaintiffs claim to have suffered. In doing so, we need to determine whether the claims are supported by facts actually alleged in the complaint or revealed in discovery.

First, the plaintiffs argue here that the challenged rule deprived them of "the benefits of living in an environment integrated with children." It is true that harm of this type might satisfy the injury-in-fact requirement. Nowhere in their amended complaint, however, do the plaintiffs allege that they suffered such harm. They allege only "economic losses, humiliation, embarrassment, mental anguish, inconvenience, anger, and the deprivation of civil rights." Likewise, Mr. and Mrs. Hamad never testified that they were deprived of social

relations, business advantages, or other benefits attributable to living in a community with more children. Only Ms. Joyella has stated, in an affidavit, that Woodcrest's bylaws "prevented [her] from enjoying the social benefits of living in a community that includes families." This unadorned and conclusory statement presents a close call, but I am not persuaded that any of the plaintiffs has alleged sufficient facts to support the claim of injury.

Second, the plaintiffs contend that they suffered emotional distress and indignity because of the challenged rule. There is, to be sure, evidence that the plaintiffs felt unwelcome and even harassed during their residency at Woodcrest. The plaintiffs' distress is clearly attributable to their disputes with Woodcrest's board, however, and not to enforcement of Woodcrest's first-floor rule. The Hamads lived at Woodcrest for over two years, and had a child for about 13 months,[2] before their relationship with the board became strained as a result of Mrs. Hamad's advocacy on the busing issue. Similarly, it was not enforcement of the first-floor rule that caused Ms. Joyella's distress; her discomfiture stemmed from her letter-writing battle with the board and from "gossip and slander" about her nephew. And none of the plaintiffs offered any evidence of "stigmatic" harm from living in a community where children were welcome only in ground-floor units.

Third, the Hamads maintain that they have suffered inconvenience from living in a ground-floor condominium and that Woodcrest's rule has made selling their condominium more difficult. But the Hamads chose the ground-floor condominium after being shown two available third-floor units, which they were free to purchase. And the rule does not prevent the Hamads from selling their condominium to anyone they choose, including a family with children. The Hamads speculate that Woodcrest's rule has affected the market for their condominium, but the record does not support that speculation. Mrs. Hamad testified that the potential buyers who had viewed the condominium decided not to purchase it for reasons having nothing to do with children: "they have pets," "[t]hey don't want a first-floor unit," "they're looking for less space," or they "weren't ready to buy yet."[3]

Fourth, Ms. Joyella claims that she was deprived of the opportunity to live with her nephew. It is true that the Board initially denied permission for Ms. Joyella's nephew to live with her (and, at her request, signed a document to that effect). But Ms. Joyella did not have custody of her nephew at that time. When he was finally placed in her care, the nephew in fact came to live with Ms. Joyella at Woodcrest. There is no evidence that he could have lived with his aunt sooner had it not been for the board's denial of permission.[4] In sum, the record does not demonstrate that the plaintiffs suffered any "distinct and palpable" injury caused by enforcement of the challenged rule; I would affirm the district court's summary judgment rulings on that basis.

For the same reason, I would affirm the district court's denial of the plaintiffs' motion for a preliminary injunction. And there are other reasons why the plaintiffs are not entitled to injunctive relief. In a settlement agreement with the United States, Woodcrest has agreed to rescind the challenged rule. The plaintiffs' claim for injunctive relief is thus moot insofar as it relates to "familial status" discrimination. For the reasons set forth below, I believe that the defendants were

---

[2] Mr. Hamad testified that the baby was born in August of 1998.

[3] The majority opinion states that Ms. Joyella was injured insofar as she was limited in her ability to sell her third-floor condominium. That might well be the case, but Ms. Joyella did not allege such an injury or offer facts to prove it.

[4] It seems to me that the case of *Gorski v. Troy*, 929 F.2d 1183 (7th Cir. 1991), is factually inapposite. Unlike the plaintiffs in *Gorski*, Ms. Joyella was not evicted because of her desire to have her nephew live with her.

entitled to judgment as a matter of law on the retaliation issue; that being so, I do not believe that the plaintiffs have any right to an injunction against retaliation.

### III

As to the district court's granting of judgment as a matter of law on the plaintiffs' retaliation claim, the history of events described above suggests that the defendants took no action against the plaintiffs "on account of" the plaintiffs' exercise of their right to sue under the Housing Act. See 42 U.S.C. § 3617.

The "neighborhood fight" had been in progress for months, after all, when the defendants – exercising their right to petition for redress of grievances – wrote to the county commissioners about the lawsuit recently filed by the "Director of Monroe County Commission on Aging," Mrs. Hamad. The defendants complained that the lawsuit was contrary to the purpose of the commission on aging and asked the county commissioners to "do whatever [they] can to eliminate the situation." There was also evidence at trial that one of the defendants had spoken with the chairman of the board of county commissioners about the lawsuit.

These contacts with what may be considered Mrs. Hamad's employer hardly constituted illegal retaliation for an exercise of rights under the Housing Act. The contacts had nothing to do with fair housing rights, as I see it, and everything to do with the board's perception that Mrs. Hamad was subjecting the condominium association to unfair harassment and expense. In any event, the defendants did no more than inform the county commissioners of the lawsuit, express their displeasure, and ask for help. What kind of polity is it that would brand this as actionable retaliation?

As to Ms. Joyella, there was evidence at trial that the defendants posted two or three notes on her door with regard to violations of Woodcrest's bylaws. These notes were not of a threatening or harassing nature, and they appear to have

been concerned with genuine violations. I do not think they can reasonably be construed as retaliatory.

### IV

The district court did not abuse its discretion, in my opinion, by denying the plaintiffs' motion to amend their complaint. The amendment would have added generalized allegations that the defendants engaged in "[o]ther retaliatory acts" after the filing of the plaintiffs' lawsuit. By broadening the scope of the complaint without giving the defendants notice of the specific acts of which they were accused, the amendment might well have prejudiced the defendants unfairly. And the fact that the motion to amend was made late in the pretrial process increased that danger.

The majority opinion faults the district court for its comment that the motion was made "after discovery has closed, after the deadline for dispositive motions has passed, and only a month before trial." Notwithstanding the absence of pertinent docket entries, I do not view that comment as suggestive of an abuse of discretion. I do not know that the district court had not set informal deadlines for discovery and dispositive motions, and the gist of the court's statement – that it was too late in the game to amend the complaint – was reasonable.

### V

I would affirm the district court's rulings across the board. My colleagues on the panel having seen the matter differently, I respectfully dissent.